Motion to dismiss appeal denied January 15; argued September 11; affirmed November 6, 1946

# FRITZ v. FRITZ

**(174 P. (2d) 169)**

Charles W. Redding, Judge.

*Gunther F. Krause*, of Portland (with William S. Nash, of Portland, on brief), for appellant.

*Elton Watkins*, of Portland, for respondent.

Before BELT, Chief Justice, and KELLY, BAILEY, BRAND and HAY, Justices.

BAILEY, J. Both the plaintiff, Fred A. Fritz, and the defendant, Blanche H. Fritz, seek a decree of separation from bed and board for an unlimited time and the custody of their minor children. From a decree granting the defendant a separation and custody of the children, and requiring the plaintiff to contribute to her for her and the children's support and maintenance, plaintiff has appealed.

In his complaint, filed August 4, 1944, plaintiff accuses the defendant of cruel and inhuman conduct toward him, consisting of the following: Refusal to permit him to live in the family home, to exercise any authority over the home or children, or to bring his friends to their home; refusal and failure to properly care for the home; insulting his friends; calling him a liar, a jelly fish and spineless creature; reviling him "to almost anyone who was willing to listen"; using physical violence upon him; telling him that she did not love him; falsely accusing him of being intimate with other women and frequenting houses of prostitution.

He also charges her with lack of proper supervision and control over the children, violently beating them, repeatedly accusing plaintiff of infidelity in their presence, poisoning their minds against him and his

mother, and grossly neglecting their care. He further alleges that she has no real affection for the children and that they are in fear of her.

To the foregoing complaint the defendant filed an answer in which she denies the accusations made against her, and in a separate answer and cross-complaint charges the plaintiff with cruel and inhuman conduct toward her, which consists of the following: A sullen and unpleasant disposition; failure to show any love or affection for her and often demanding that she get a divorce; the frequent use of profane language; becoming angry at her when the fourth child was born, stating that he did not want the child; indulging in criticizing, nagging, tantalizing and irritating her and in faultfinding; striking her on many and various occasions, breaking her eye glasses, and on one occasion knocking her unconscious; neglecting his home and family for other people; failure and refusal to help or provide help for her in caring for the children and home; having an affair with another woman, and neglecting his home and family on account of her.

During the trial, and on March 6, 1945, plaintiff filed an amended complaint in which he repeats all the allegations hereinbefore mentioned and further alleges that defendant has grossly neglected the education of the children by failing to assist them in their studies, by keeping them from regular attendance at school on the pretext of illness, and by failure to send them to school in time to avoid being tardy. It is further alleged in the amended complaint that "all of said course of conduct on the part of defendant has continued to the date of this first amended complaint."

Thereafter, and on the 12th day of March, 1945, the defendant filed her amended and supplemental answer

in which she denies the charges made against her in the amended complaint and affirmatively alleges other acts of cruelty on the part of plaintiff occurring, or of which she acquired knowledge, since the filing of her original answer and cross-complaint, as follows: Disposal of most of his property to his mother immediately preceding their marriage; improper and attempted intimate conduct with a friend of defendant's; inducing several women to go with him to her home while she was absent therefrom for the purpose of inspecting the premises; employing a detective to move into the apartment above theirs to spy upon her; taking a female friend with him while visiting the children at school; embracing, kissing and making love to his female help, and accusing her, while testifying, "of improper and undue intimacy with a certain acquaintance, well knowing the same to be false and unjust."

We have not attempted to set forth in detail all the accusations made by each of the parties.

■ Plaintiff did not file a reply to either defendant's original or supplemental answer, and it is now contended for the first time by the defendant that on account of such failure the plaintiff has admitted the affirmative allegations contained in those answers. The case was tried as if the affirmative matter contained in the answers had been put in issue. Had the defendant raised that question in the circuit court, the plaintiff, by leave of court, could, and undoubtedly would, have supplied the omissions by filing the necessary reply. *Minard v. McBee*, 29 Or. 225, 44 P. 491. Having voluntarily gone to and proceeded throughout the trial as if the affirmative allegations in her answers had been denied, the defendant waived the necessity of filing a reply. *Minard v. McBee*, supra; *Cole v. Cole*,

157 Or. 566, 73 P. (2d) 383; 41 Am. Jur., Pleading, § 180, p. 420; 49 C. J., Pleading, § 1247, p. 845.

Before discussing the evidence, we shall dispose of defendant's motion to dismiss the appeal. She claims that the plaintiff, by contributing to the support and maintenance of defendant and their children in accordance with the provisions of the decree, had accepted the benefits of the decree and is therefore precluded from appealing therefrom.

■■ The law is well settled that a party cannot claim the benefit of a judgment or decree and at the same time appeal from it. It is likewise well settled that a party is not precluded from taking and maintaining an appeal by the fact that he has paid the judgment or decree against him, unless it satisfactorily appears to the court that the payment was voluntary and was made with a view of settlement. *Edwards v. Perkins,* 7 Or. 149; *Duniway v. Cellars-Murton Co.,* 92 Or. 113, 170 P. 298, 179 P. 561; *Coker & Bellamy v. Richey,* 108 Or. 479, 217 P. 638; *Heider v. Unicume,* 142 Or. 410, 14 P. (2d) 456, 20 P. (2d) 384; *Staiger v. Holman,* 144 Or. 67, 6 P. (2d) 43, 18 P. (2d) 591, 23 P. (2d) 917. Compliance by the plaintiff with the order of the court was not voluntary, nor was it made for the purpose of settlement of the controversy. Therefore the motion to dismiss is denied.

Thirteen days were spent in the trial of the case. The record includes about 1,700 pages of testimony and 81 exhibits. Forty-three witnesses were called, 18 for the plaintiff and 25 for the defendant.

At the conclusion of the trial the court decided the matter in an oral opinion delivered from the bench, which opinion is incorporated as a part of the transcript

of testimony, and to portions of which we shall hereinafter refer. No findings of fact were made.

We shall not discuss the evidence in detail. The plaintiff and defendant were married in Portland on June 19, 1935. He was about 40 years of age and she was 25 years of age. Four children, the first and third being daughters, were born as the result of this marriage. The dates of their births are as follows: April 17, 1936, June 21, 1937, September 24, 1938, and May 16, 1940. Shortly before the birth of the second child, plaintiff and defendant moved from an apartment house to the first floor of a duplex house owned by his widowed mother, the second floor being occupied by her. The defendant and the children are still living in that house. Plaintiff left there on or about May 21, 1944, and about the same time his mother also moved from the house.

At the time of their marriage, plaintiff was operating the Workingmen's Club, commonly known as Erickson's, in Portland, Oregon. The business was owned by his father at the time of his death which occurred a few years before the marriage of the parties involved in this litigation. Considerable time was taken up during the trial as to the ownership of the business, that is, whether it belonged to the plaintiff, who was the only child, or to his mother. That question, however, is not involved on this appeal.

In the Workingmen's Club, the plaintiff conducted a restaurant, a bar, and a card room. Shortly after the entry of this country in World War II, the plaintiff, or his mother, took over the lease on the Erickson hotel which has since been operated by the plaintiff. The Workingmen's Club was open from 5 o'clock in the morning until 12:30 or 1 o'clock at night. Much of the

plaintiff's time was spent there. Asked what his hours of work usually had been, Mr. Fritz testified as follows: "It is pretty hard to say. I was needed there all the time and I put in as much time as I possibly could; sixteen hours, sometimes twenty-four hours the clock around." According to the testimony, he usually came home for dinner, arriving there at any time from 6 o'clock to 8 o'clock in the evening. After eating his meal he would return to his business about 9 o'clock and stay there until 2, 3, 4, or 5 o'clock the next morning.

Mrs. Fritz, until May, 1939, did all, or practically all, the housework and cared for the children. She then had the help of high school girls for brief periods. One of these girls, however, worked during the summers of 1940 and 1941. Beginning in October, 1941, and for about eleven months, she hired a woman for Monday and Tuesday of each week to do the washing and ironing. A few times she procured someone to stay with the children when she went out in the evening.

The evidence covers the period from the date of their marriage almost to the end of the trial. Plaintiff testified that when they started on their wedding trip they had an altercation soon after the train left Portland. Referring to this incident, he stated that "If the train hadn't been going and if I hadn't been married in church I would have walked out, because I realized that something was not going to work." He resolved, however, "that come what may, I was going to do everything that I could to make it a success". We concur with the conclusion of the trial court that Mr. Fritz has made no real attempt to effect that resolution.

Plaintiff's lack of interest in his home is well and correctly expressed by that court, as follows: "To you [Mr. Fritz] your home is only a place apparently that

you spent principally your sleeping hours. I gather from the exhibits that your annual average income was around nine thousand dollars, and you could have given serious consideration to some other place [referring to the defendant's testimony that she had wanted to move away from the house in which his mother lived], or at least encouraged her by holding out a promise in the future that when the matter could be solved there would be some other place. You never had much thought for her or the children. * * * However, you have not made any great sacrifice in the ten years of your married life; you have made no great effort to go out of your way for the sake of your children. Your interest has been more casual."

Two of Mrs. Fritz's principal accusations against her husband have been sustained by a preponderance of the evidence, to wit, the charge that he questioned, without cause, the paternity of their youngest child, and that he, without justification, struck her more than three times, once knocking her down and blacking her eye, and twice breaking her glasses. He admits that he struck her two or three times but denies that he knocked her down or that he broke her eye glasses.

We are also of the opinion that defendant has proved many of the minor charges against her husband. Reference has already been made to his lack of interest in his wife and children. He was continually finding fault with defendant about the condition of the house and the manner in which she cared for the children. Mrs. Fritz did the cooking, sewing, and most of the washing, in addition to caring for the children. The eldest child was only four years and one month old when the youngest was born. Under the circumstances, we think that she has done as well as could be

expected in caring for the home and the children, with the help that was available to her. He employed a detective to live in the apartment vacated by his mother, to watch his wife and children; he took women to her home, while she was absent at church, to inspect the house for the purpose of gathering evidence as to its condition; he visited their children while at school, accompanied by his female friends, and did many other things which greatly annoyed and humiliated her.

It is admitted by the defendant that she called her husband "a jellyfish and spineless creature". She claims that this was evoked by the fact that he spent so much time with his mother, and by the further fact that "he always did what Mama wanted him to do". It is further admitted by Mrs. Fritz that on and after June 19, 1944, which was their ninth wedding anniversary, and also after he had left their home, she charged him with being intimate with one of his female employees, commonly referred to in the evidence as "the blonde". There is nothing in the record which establishes immorality between this employee and the plaintiff, but there is sufficient to arouse a jealous wife's suspicions. Plaintiff admits putting his arms around and kissing this employee on different occasions and taking her home after working hours. The evidence also discloses that there were rumors circulating around the Workingmen's Club, which reached defendant's ears, that plaintiff was very attentive to the blonde, showing her unusual favors. Moreover, from about the first of June, 1942, until the first part of December, 1943, while the blonde was employed at the restaurant, the plaintiff, except on Sundays, "didn't have time to come home for dinner". The evidence is undisputed that the plaintiff was paying the blonde $325.00 a month to work as a waitress. She also received tips for her services.

■ We have carefully examined the entire record and are of the opinion that the trial court correctly decided the issues involved in this litigation. After reviewing the evidence in the case, that court properly analyzed the situation, as follows: ''To sum it up, I feel that Mrs. Fritz's constant complaining and even the accusations she has made against her husband have been provoked by Mr. Fritz. I think she was driven to distraction by losing what to a woman is the greatest possession in her life—her husband. She saw her husband slipping away from her. She has carried a child I guess fifty per cent of the time or nearly that, nearly four years of the time; she has had more to do than any woman ought to be called upon to do in raising four children, especially at the ages of these youngsters. * * * As far as Mr. Fritz is concerned, he didn't marry until he was forty. He left a life of independence. He was raised as an only child by a mother who, in attempting to shower every care upon him, did him an injustice rather than being helpful. Obviously he wasn't willing to make the sacrifice to make the marriage a success.''

■ In divorce proceedings relief is not invariably denied when the record discloses that neither party is entirely free from fault. Before a decree of divorce will be granted on the ground of cruel and inhuman treatment, it must appear that such treatment was unjustified by provocation and was out of proportion to any wrong committed by the complaining party. The parties must not be *in pari delicto*. *Condit v. Condit*, 115 Or. 481, 237 P. 360; *Mueller v. Mueller*, 165 Or. 153, 105 P. (2d) 1095; *McElwee v. McElwee*, 171 Or. 462, 138 P. (2d) 208; *Fuller v. Fuller*, 175 Or. 136, 151 P. (2d) 979.

This proceeding is brought pursuant to chapter 408, Oregon Laws 1941. Permanent separation may be

decreed only on the ground of adultery. § 1. Separation from bed and board for a limited or unlimited time may be decreed on four grounds, which are the same as four of the grounds specified for granting a decree of divorce, (see § 9-907, O. C. L. A.) one of these grounds being cruel and inhuman treatment or personal indignities rendering life burdensome. § 2. Section 7 of the act provides in part as follows:

"Whenever the court shall grant a decree of separation from bed and board, it shall have power further to decree as follows:

"1. For the future care and custody of the minor children of the marriage as it may deem just and proper, having due regard to the age and sex of such children and, unless otherwise manifestly improper, giving the preference to the party *less in fault;* * * *" (Italics supplied).

■ The legislature, in enacting this law, impliedly at least, recognized that a decree of separation might be granted to a litigant who was not entirely free from fault. Otherwise, it would not have provided for awarding the custody of the children "to the party less in fault".

■ We do not think that Mrs. Fritz was entirely without fault. Her shortcomings, however, were not disproportionate to the treatment that she received from her husband. She is not, in other words, *in pari delicto.*

One of the many accusations which plaintiff makes in his complaint against his wife is that she "has reviled the plaintiff to almost anyone who was willing to listen". He asserts that she gave false testimony concerning this charge and that therefore she should be denied relief on the ground that she is not in court with clean hands. Before discussing the evidence relating

to that charge, we shall consider the cases relied upon by plaintiff in support of this proposition of law.

It is well settled that the doctrine that he who comes into equity must come with clean hands is applicable to divorce cases. *Hollingworth v. Hollingworth,* 173 Or. 286, 145 P. (2d) 466. One of the cases on which plaintiff strongly relies is *Pfender v. Pfender,* 104 N. J. Eq. 107, 144 A. 333. It appears from the facts in that case that the court had granted a decree *nisi* to the plaintiff based upon an "unjust accusation of infidelity" by his wife. Before the decree became final, a petition was filed to set it aside on two grounds, to wit: "(1) deception of the court by the petitioner in the main case; and (2) adultery by the petitioner since the entry of the decree *nisi* and before final decree." The court in its opinion stated that on the hearings in the main case it was led to believe that the friendly relations existing between the plaintiff and Miss Hass were of short duration and had been long since ended. It developed on the hearing of the petition that this relation between him and Miss Hass had never ceased and therefore the decree *nisi* was vacated and plaintiff denied relief. In the course of its opinion the court stated that in *Clickner v. Clickner,* 95 N. J. Eq. 479, 123 A. 373, it was held that "where a suitor in equity has been guilty of false or misleading testimony and conduct in the presentation and hearing of his cause, his suit will be dismissed, irrespective of whether or not he might otherwise be entitled to relief."

*Clickner v. Clickner,* 95 N. J. Eq. 479, 123 A. 373, referred to in *Pfender v. Pfender,* supra, was a suit by the husband for annulment of marriage on the ground of fraud, consisting in the concealment by defendant of

the fact that she was pregnant by another man". Defendant denied the alleged concealment and alleged that she had made full disclosure at the time petitioner asked her to marry him. The court found that before the marriage the defendant had informed the plaintiff "of the fact, at least, that she had had antecedent sexual intercourse." In denying relief to the plaintiff, the court, in its opinion, among other things, said: "In the first place the petitioner has been guilty of an attempt fraudulently to impose upon the court—to induce the court to believe that defendant did not disclose to him the fact of her previous intercourse, and that he entered into the marriage in the belief that she was chaste. * * * This attempt to deceive the court was obviously made in the belief that it was necessary or advisable in making out his right to decree, and for the purpose of endeavoring to obtain such decree. It seems to me, therefore, that denial of relief to petitioner might well be rested upon that ground, somewhat akin to the ordinary application of the equitable principles which require a suitor for equitable relief to do equity, and to come into court with clean hands."

It is stated in another New Jersey case, *Zearfoss v. Zearfoss,* 112 N. J. Eq. 530, 164 A. 893, that the "petitioner's conduct in falsely and fraudulently stating in the petition that the name of the alleged particeps criminis was unknown to him, at the time of the filing of the petition, and in taking a false affidavit in verification of the petition, is unconscionable and requires the dismissal of the petition, under well-established principles of equity." The chancery rules of the court provided that "in suits for divorce on account of adultery the petition shall state the name of the person with whom the adultery was committed, if known * * *."

The court of chancery of New Jersey, in *Meyer v. Blacker,* 120 N. J. Eq. 35, 184 A. 191, decided subsequent to the cases hereinbefore referred to and not mentioned by the plaintiff, cited all three of those cases as supporting the rule that where ''a party in litigation knowingly makes false statements as a basis for relief, he should be denied relief.''

In *Wright v. Wright,* 350 Mo. 325, 165 S. W. (2d) 870, the plaintiff, who was the wife, had instituted suit for separate maintenance and had recovered a judgment against defendant requiring him to pay a designated sum for her maintenance. Thereafter defendant filed a motion in that suit asking the court to set aside and terminate the judgment, alleging as ground therefor that on a date subsequent to the entry of that judgment he had obtained a divorce from plaintiff in a district court in Nevada. The Missouri court refused to recognize the decree of divorce entered in the state of Nevada on the ground that the husband in the divorce case had falsely represented that he was a bona fide resident of Nevada and thereby induced the court of that state to take jurisdiction of his case. For that reason, and for the further reason that he had not disclosed to the Nevada court the existence of the Missouri judgment, it was held that he did not come into court in the maintenance suit with clean hands.

The court, in *La Barge v. La Barge,* 264 Mich. 615, 250 N. W. 328, referred to the maxim which we are here discussing and concluded that the trial court ''was right in view of the record in finding the situation of these parties intolerable'' and in awarding the wife a divorce.

In *McNeir v. McNeir,* 178 Va. 285, 16 S. E. (2d) 632, Mrs. McNeir sought to have a decree of divorce which

she had procured in Nevada declared void in a Virginia court on the ground that it was secured through "misrepresentations and false and fraudulent testimony". The court held that one who has participated in obtaining a fraudulent divorce is not entitled to allege its invalidity.

The only remaining case cited by plaintiff is *McClees v. McClees,* 162 Md. 70, 158 A. 349. The court there held that plaintiff, who was the wife, was not in court with clean hands for the reason that after "destroying the peace and happiness of the household", she abandoned the husband's domicile without cause.

Under the general and indefinite averment that the defendant "has reviled the plaintiff to almost anyone who was willing to listen", plaintiff introduced testimony of alleged abusive statements about plaintiff purportedly made by defendant to other persons. The witnesses testified that the statements attributed to her were made after the plaintiff filed his suit for separation.

Plaintiff, in his case in chief, called defendant as a witness and questioned her in regard to all his charges. More than 160 pages of the transcript are devoted to this testimony. We quote therefrom as follows:

"Q. You have told a great many people about his having hit you since that time, haven't you?

A. After he left home, yes.

Q. You called up everybody you could think of?

A. No, Mr. Krause.

Q. Let me review a few that you did tell. There was this insurance adjuster that was calling at the house—

A. (Interrupting) What insurance adjuster?

Q. When you had the fire in connection with the furnace.

A. I never did anything of the kind.

Q. Do you recall after Mr. Fritz had left an insurance adjuster wanted to talk to Mr. Fritz about a loss down at the business; he called up the house and tried to get in touch with Mr. Fritz, and do you remember what you told him at that time about what kind of a man Mr. Fritz was?

A. About two weeks ago, wasn't it?

Q. It was more than two weeks ago, it was several months ago, soon after Mr. Fritz had left. You had no conversation with him at all?

Mr. Watkins: I think he ought to fix the time so she knows what she is denying.

The Witness: An insurance adjuster called up in February trying to locate Mr. Fritz, but I didn't tell anybody about black eyes. How could I?

Q. [by Mr. Krause] You have never told any insurance adjuster that was calling up to talk to Mr. Fritz what you thought of Mr. Fritz?

A. No.''

The plaintiff refers particularly to this last question and answer and contends that the answer was false. In that connection he calls attention to the testimony given by Mr. Courtright, who was later called as a witness by the plaintiff. Mr. Courtright testified that he was an insurance adjuster and that on August 10, 1944, which was several days after the institution of this proceeding, he telephoned Mr. Fritz's home, and in response to his question as to where Mr. Fritz was, Mrs. Fritz stated that he had not lived there for about two months, ''and she thought that he was living down there with his mother and Maxine

[the blonde] \* \* \*"; that Mr. Fritz was paying Maxine $325.00 a month and tips, and that she also added "she was suing Mr. Fritz for a divorce". In the pencil notes, an exhibit in the case, which Mr. Courtright claims that he made shortly after the telephone conversation, but for what purpose is not made clear, we find the following which purports to be the substance of her remarks to him: "He has been cozy with Maxine, the cashier at his club. He paid Maxine $325 a mo. to work plus her tips. Now it is supposed that Fritz, his mother and Maxine are living at Erickson Hotel. They moved there this spring. Maxine has husband in army." On defendant's direct examination by her own attorney, she denied that she told anyone that her husband was suing for a divorce, and stated that when she was asked, she told the inquirer that there was a suit for separation pending. In regard to the Courtright testimony, she stated:

"Q. 'He has been cozy with Maxine, the cashier at his club.' Do you recall telling this strange man anything like that?

A. No.

Q. 'He paid Maxine $325 a month.' Did you ever have access to the books to know whether—

A. (Interrupting) Yes, I was down there in the—

Q. (Interrupting) Well, were you told this and did you know that he was paying this, or was it hearsay?

A. I saw it on the books, the reports that he sends in to the Custom House and it was $325 on the books, and he made the remark that Maxine was making more than the boss.

\* \* \* \* \*

Q. Now he starts off with another sentence, and I don't know whether he means to say that you

did it or not, but he wrote it down here: 'Now it is supposed that Fritz, his mother, and Maxine are living at the Erickson Hotel.'
Did you—
A. (Interrupting) No.
Q. You knew that his mother—
A. (Interrupting) I had reason to believe that she was with friends or in another part of town.
Q. 'Maxine has a husband in the army.'
A. She told me that her husband was in the army."

Reverting now to the direct examination of Mrs. Fritz by the attorney for the plaintiff, we find, immediately following the testimony hereinbefore quoted from that examination, this testimony:

"Q. [By Mr. Krause] Do you remember the man that came out to repair the furnace after some of the wrappings on the pipes had come off? What did you tell him about Mr. Fritz? That was just last summer or even later than that, it was this fall, as a matter of fact.

\* \* \*

A. I said he had a marvelous personality.
Q. But you also told him he was a very evil person, didn't you?
A. I can't remember that.

\* \* \*

Q. What did you tell this sheet metal worker about the type of a man Mr. Fritz was?
A. That he was a Dr. Jekyll and Mr. Hyde character.
Q. What did you tell him about his relationship with women?
A. I couldn't tell him anything. I told him I had heard about his carrying on with this blonde."

On direct examination by her own attorney, Mrs. Fritz stated as follows concerning the testimony given by Ben Rosenbloom:

"Q. And he [Mr. Rosenbloom] said that you told

him that Mr. Fritz didn't live there any more, that you were separated, and he said, 'I am sorry to hear it', and then he asked you what seemed to be all the trouble and you told him, and he said, 'Is that all that is wrong?' and you said that Mr. Fritz was chasing around with a blonde and Mr. Fritz had accused you of not taking care of the children, and that the whole thing lasted a half an hour, and that while you were talking some child started to cry and that you said, 'You just shut up.' Did any conversation like that occur, going over all that for half an hour?

A. No, Mr. Watkins. He did call. I asked who it was and he told me his name and I said, 'Mr. Fritz doesn't live here any more.' Then he asked me what was the trouble and I said, 'It is just another one of those war casualties, that is all.' The conversation was quite brief."

Mrs. Fenolio, a witness for the plaintiff, testified that she had had a telephone conversation with Mrs. Fritz and that Mrs. Fritz had "accused him for one thing of receiving a greeting card of some kind from Maxine who was working for him at the time, and she also said he was keeping up Maxine, and I said, 'You don't believe that, do you?' And she said, 'I certainly do.' Mrs. Fritz admitted that she had had this conversation with Mrs. Fenolio and further stated: "I told about the birthday card that he received from Maxine in July of 1943, and laughed about it, because he thought it was so wonderful. He just barely let me see it and stuck it back in his pocket. The one I gave him was just thrown aside." Mrs. Fritz made no specific denial of the other statement ascribed to her by Mrs. Fenolio.

Mrs. Helen C. Prudhomme, a lifelong friend of the plaintiff, was called as one of his witnesses after Mrs.

Fritz had completed her testimony. Mrs. Prudhomme testified that in February, 1944, a few weeks before the commencement of the trial, Mrs. Fritz had telephoned her and asked for the address of a mutual friend, which she gave her. Mrs. Prudhomme further testified that Mrs. Fritz told her about the pending suit for separation and asked her whether she had not heard "about his blonde", to which she answered in the negative. She also said that Mrs. Fritz had made other derogatory remarks about her husband.

On cross-examination Mrs. Fritz was asked by the attorney for plaintiff about this telephone conversation. She admitted that she telephoned Mrs. Prudhomme and asked for the address which Mrs. Prudhomme had mentioned. She denied, however, that she had made the statements about her husband which had been attributed to her.

In addition to the foregoing testimony, Mrs. Fritz testified on direct examination by her own attorney as follows:

"Q. He says you have reviled him to almost anyone who would listen. Did you ever revile anybody?

A. That is not true. My neighbors didn't know the things that were going on and my own mother didn't know what was going on. My very best friend who has known me for twenty years' testified on the stand yesterday that she did not know what was going on.

Q. Well, you never reviled him to anyone, let alone almost anyone who would listen?

A. No, that is not true."

In this jurisdiction, in order to constitute a person a false witness he must be false intentionally.

He must have uttered a conscious falsehood. *State v. Weston,* 109 Or. 19, 49, 219 P. 180; *Simpson v. Miller,* 57 Or. 61, 110 P. 485, Ann. Cas. 1912D, 1349, 29 L. R. A. (N. S.) 680. The record does not justify the conclusion that Mrs. Fritz consciously or intentionally denied the statements claimed by these witnesses to have been made by her. The trial of the case lasted 13 days and she was subjected to a long and grilling cross-examination by counsel for the plaintiff. We are favorably impressed by the manner in which she testified. She did not appear to be concealing any fact or attempting to deceive the court.

■ Even if it be assumed, for the purpose of argument, that Mrs. Fritz gave false testimony in respect to the matter here under discussion, we do not think that the authorities relied upon by the plaintiff are in point. The facts in those cases are very dissimilar to those in the case at bar. In all of the New Jersey cases referred to, except the third, there was a complete failure of proof on the part of the plaintiff; in the third case it was held that the petitioner was not in court with clean hands because of the false averment in his petition. In each of the other cases in which relief was denied, the decision was based upon the unconscionable conduct of the plaintiff prior to the institution of the suit. In none of these cases was redress denied a litigant merely because he was found to be false concerning some matter which was not the basis for relief. A court of equity is not required to close the door to inquiry because it finds a suitor false in some aspect of the case. In its discretion it may in an extreme case disregard wholly the testimony of a witness willfully false on a material issue. Under all the facts and circumstances of this case, we think it would be improper to evoke the

doctrine of clean hands against the defendant, even if she were found to be false as contended by plaintiff.

■ The circuit court awarded the custody of the children to the mother and provided for her support and maintenance and that of the children by the plaintiff. Mr. Fritz does not question the provision in the decree relating to support and maintenance in the event the defendant is granted a decree of separation and the custody of the children. In addition to resisting the granting of a decree of separation to the defendant, he asserts that the mother is not a proper person to have the custody of the children and asks that their custody be given to him. The circuit judge, with the consent of the parties to this litigation, had the children brought to his chambers where he conversed with them. Based upon this interview and the evidence in the case, he awarded the custody of the children to the mother. This action on his part was for the best interest and welfare of the children and should not be disturbed.

■ Defendant has filed a motion for additional attorneys' fees and expenses in this court. At the time this motion was filed her counsel overlooked the fact that defendant had already been paid by the plaintiff, pursuant to an order of the circuit court, $1,000.00 on account of attorneys' fees in this court, and $100.00 on account of expenses to be incurred by her on this appeal. No objection is made by plaintiff to that order. In addition to the foregoing amounts defendant has been paid $1,800.00, attorneys' fees, and her costs and disbursements in the trial in the circuit court. Her disbursements in this court will not exceed $100.00, and we think that the $1,000.00 is an ample allowance to her for attorneys' fees on this appeal. Therefore

her motion for additional attorneys' fees and expenses is denied.

We find no error in the decree of the lower court, and it is affirmed. In view of the amounts paid to defendant by plaintiff on account of expenses and attorneys' fees in this court, pursuant to the order of the circuit court, no further costs will be allowed her on this appeal.