FLOYD H. BISSELL, JR., PLAINTIFF AND RESPONDENT, v. MARY ROSE BISSELL, DEFENDANT AND APPELLANT.

No. 9443.

Submitted February 16, 1955.   Decided May 27, 1955.

Petition for Rehearing and Modification Denied June 9, 1955.

284 Pac. (2d) 264

188

Ralph J. Anderson and Stanley P. Sorenson, Helena, for appellant. Paul T. Keller and Melvin E. Magnuson, Helena, for respondent. Mr. Anderson and Mr. Keller argued orally.

MR. CHIEF JUSTICE ADAIR:

Appeal by defendant wife from decree of divorce entered against her.

The parties intermarried July 23, 1946, at Weisbaden, Germany. They have no children. He came from Conrad, Montana—she from Cleveland, Ohio. At the time they were wed both were serving overseas in the armed forces of the United States. He was a sergeant in the army,—she a clerk-typist with the rank of sergeant in the air force. Shortly after the wedding the wife obtained a discharge from further military service on the grounds of the marriage. Since then she has had civilian status while her husband continued in the army. Apparently there has been much domestic discord and strife in the couple's married life from the very beginning.

Because of such disharmony, and before the husband had completed his military assignment in Germany, he petitioned the army to be returned to duty in the United States. He testified: "I petitioned for the reasons I thought there was a possi-

bility we could be reconciled and make a go of our marriage. So they allowed me to come home earlier, at that time."

In May 1948 the couple returned to this country.

The wife testified:

"Q. At whose instance was that return made? A. Mine, I requested transportation back home."

The husband was first put on thirty days leave. He then was assigned as first sergeant at the Great Falls Air Base at Great Falls, Montana. He testified that he spent part of his leave in Cleveland, Ohio, where his wife's folk live and the remainder in Conrad, Montana, whereof he was a resident at the time he first enlisted in the army.

The husband was stationed at the Great Falls Air Base for about three months during which time his wife remained in Cleveland. He testified: "We separated before I actually turned in for my leave and she returned to Cleveland."

In the latter part of 1948 the husband was assigned to duty in the organized reserve corps at Helena, Montana, where he was stationed for about three years. During this assignment his wife came to Helena.

He testified that his wife "definitely did not like Montana. She harrassed me continually to try to get a reassignment. * * * We never did get along in Helena, Montana; I believe we separated approximately 10 times while I was here. I would continually have to move out of the house and go downtown to one of the hotels. We had a rented apartment in the Hustad Apartments, which was fine, but I couldn't afford to maintain two residences. My rent in Helena was $70.00 a month, plus utilities, and my house rent and grocery bill went on, and on my salary, I could not maintain two different places. I couldn't live at home and the army wouldn't relieve me of that duty, or assignment at that time. * * * She continually talked about my army friends and she didn't like my grade in the army,—it wasn't high enough to suit her. At one time I moved out after one of our spats and I came back in Sunday afternoon. And she said to me: 'I am going to put you in jail.' I said: 'That

is impossible when you don't have any grounds.' She walked out of the house and a while later two policeman came. I was not very well acquainted with the operation but one of them said: 'We have to take you in.' And they said: 'Your wife made a complaint against you.' They put me in jail * * * I was bailed out. Major Ambrose Ryan came down and got me out with Attorney Clarence Hanley. * * * Major Ryan immediately sent a letter to the Montana Military District, requesting my relief from this type of duty due to the notoriety. The Montana Military District forwarded it to the Office of the Army with approval and the Office of the Army in turn sent the complete correspondence back to Helena with a request that full investigation be made. In the meantime we had a new officer, Colonel Ward, who came in and completed the investigation. He contacted several people in Helena of high standing as to my character and efficiency. He sent the complete correspondence back to the Office of the Army and they sent it back and said the matter would be dropped. Q. Did all that help your relations with the army? A. It definitely did not, it appears in my 201 File. That is the personal file of a soldier which follows him all over, to every new assignment. * * * Q. Now, in that connection, then your 201 File follows you and your commanding officer would see it? A. That is the one thing they look at when the soldier comes into a new unit; that is the only way they have of checking his background and determining what type of person he is. * * Every new assignment I have had in the army, I was called on the carpet. As soon as I got a new assignment, the commanding officer has said that he didn't want any of that type of trouble in his outfit.''

The husband further testified:

''Q. You spoke of being arrested. What was the reason your wife had you arrested in Helena, Montana? A. Well, she failed to appear the next morning to press charges.

''Q. So you really don't know. A. I have no idea.

''Q. You say it was without cause? A. I say it was without cause.''

In April 1951 the couple removed to Camp Stoneman, California, to which the husband had been assigned. There disharmony again held sway until finally on October 22, 1952, on the advice of the judge advocate, the husband and wife, in the presence of three attesting witnesses, entered into and signed a property settlement and separation agreement following which the wife returned to her home in Cleveland and the husband applied for and was granted a transfer to Korea where he was sent and where he remained on duty in the United States Army until the expiration of his then term of enlistment when he returned to the United States.

The husband testified:

"Q. At Camp Stoneman, did you have any difficulty with your wife? A. Continual difficulty, the same as I have always had. I had post quarters that cost me $85.00 a month and I did all my trading and buying groceries at the post commissary, which averaged $90.00 a month, the grocery bills. After one of our fights, she went over to the Red Cross on the post and borrowed $25.00 and got a receipt for it. She took the receipt, went up to the post commander, left it on his desk and claimed I failed to support her. He didn't call me in, the post commander * * * but he contacted my commanding officer and requested an investigation. My commanding officer called me in and he said: 'Bissell, I have talked to you about this trouble before.' I knew it was coming to a head and at the time I was ready to do anything and I put in to go to Korea, I requested assignment to the far east. * * *

"Q. As a result of that what happened? A. I requested either to get rid of my wife or get out of the service of Colonel Jack Dinnon. At the time I was a warrant officer on reserve status and the commanding officer has a right to request that any of his officers with that type of status be relieved of active duty, if he feels it is for the good of the service.

"Q. Now, did you make a property settlement with your wife at that time? A. Yes. The Judge advocate section at Camp Stoneman called me in and asked my wife in for a conference

and made a legal separation in which I was supposed to sell my automobile, a 1948 Chevrolet * * *

"Q. I will ask you if, as a result of that settlement, she got all of your property? A. She got everything I had.

"Q. Then you left for Korea. Is that Correct? A. She returned to Cleveland and I had my orders for Korea."

This is an action brought by the plaintiff husband for an absolute divorce from the defendant wife on the grounds of extreme cruelty. The complaint also prays for such other and further orders as to the court may seem just.

The wife interposed a pleading designated as an "Amended Answer and Cross-Complaint" which consists of (1) "amended answer to the complaint," (2) "a further and separate defense to the said complaint" and (3) a "cross-complaint against the plaintiff."

In her "amended answer" she admitted the marriage,—that at the time of the commencement of the action and for more than one year immediately preceding the institution of suit plaintiff was a bona fide resident of the State of Montana and that there are no issue of marriage but denies all of the charges of extreme cruelty made against her.

In her "further and separate defense" she charged her husband with extreme cruelty and wilful neglect and alleged that the sum of $250 is a reasonable sum to be allowed her to enable her to defend this action and that the sum of $150 per month is a reasonable sum to be paid her as temporary support money during the pendency of this action and as permanent support money thereafter.

In her "cross-complaint" she again charged her husband with extreme cruelty and wilful neglect and again alleged that $250 is a reasonable sum to be paid her for attorney fees, $150 per month for her support and $500 for doctor and hospital expenses claimed to be necessary to her health.

By her prayer she asks that plaintiff take nothing, that his action be dismissed, that she may live separate and apart from

plaintiff and that he be required to pay to her the sums and amounts as above specified.

Upon issue joined by reply the suit was tried by the district court sitting without a jury.

After hearing and considering the evidence the trial judge made and filed written findings of fact and conclusions of law and in accordance therewith, on March 13, 1954, rendered and caused to be entered a decree granting the husband an absolute divorce.

*Findings of Fact.* There are but six findings of fact. Therein the trial court found:

"I. That the Plaintiff and the Defendant intermarried at the City Weisbaden, Germany on the 23rd day of July, 1946 and ever since that day have been and now are husband and wife.

"II. That the Plaintiff and Defendant have been separated from time to time during the course of their marital life and that the married life has been intermittent on the part of both of them.

"III. That for a period of more than one year preceding the commencement of this action the Defendant herein has been guilty of inflicting grievous mental suffering upon the Plaintiff by a course of conduct towards and treatment of the Plaintiff existing in and persisted in for a period of more than one year before the commencement of this action for divorce, which justly and reasonably was and is of such a nature and character as to destroy the peace of mind of the Plaintiff and to render the continuance of the Marital relations between the parties to this action perpetually unreasonable and intolerable to the Plaintiff.

"IV. That the Plaintiff and the Defendant have previously had a property settlement and that the Plaintiff has paid the Defendant a considerable sum of money. That the Defendant has been put to some expense to defend this action but that she is now working and that she has available to her Veterans Medical service and that she is able and competent to support herself.

"V. That no children have been born to said marriage.

"VI. That the Plaintiff should pay to the Defendant some money to pay her expenses in the maintenance of the divorce action and in moving from California to Ohio which should be paid by the month."

*Conclusions of Law.* Upon the foregoing findings of fact the trial court made the following conclusions of law:

"1. That the Plaintiff have judgment against the Defendant for a divorce absolute.

"2. That the Plaintiff pay to the defendant the sum of Twelve Hundred Fifty and No/100 Dollars ($1,250.00) to be paid at rate of Fifty and No/100 Dollars ($50.00) per month, through her Attorney, Ralph J. Anderson of Helena, Montana beginning with the date of the entry of Judgment.

"3. That the Plaintiff pay to the Defendant the sum of Two Hundred Fifty and No/100 Dollars ($250.00) for Attorneys fees for maintaining this suit, also to be paid at Fifty and No/100 Dollars ($50.00) per month."

*Judgment.* By the judgment entered the trial court

"Ordered, Adjudged and Decreed: that the Plaintiff have judgment against the Defendant for a divorce absolute and that the marriage relationship between the Plaintiff, Floyd H. Bissell, Jr. and the Defendant, Mary Rose Bissell, be and the same is hereby dissolved.

"2. That the Plaintiff pay to the Defendant the sum of Two Hundred Fifty and No/100 Dollars ($250.00) as an Attorneys Fee to be paid at the rate of Fifty and No/100 Dollars ($50.00) per month.

"3. That the Plaintiff pay to the Defendant the sum of Twelve Hundred Fifty and No/100 Dollars ($1,250.00) to be paid at the rate of Fifty and No/100 Dollars ($50.00) per month beginning with the date of judgment, all such payments to be made to the office of Ralph J. Anderson, the Attorney for the Defendant at Helena, Montana."

This is an appeal by the wife from the above judgment.

The wife assigns as error the making of the trial court's finding of fact No. III, supra. At the trial the husband ap-

peared and testified as the only witness in his behalf. His testimony amply sustains the trial court's finding No. III in its entirety. The wife coming from her home in Cleveland, Ohio, also appeared and testified as the only witness in her behalf. As to the acts and conduct charged against the wife and testified to by the husband some were admitted while others were either denied, minimized or attempted to be justified by the wife in her testimony. Thus were presented issues of fact to be determined by the trial judge, the trier of the facts. The resolution of the conflict in the evidence was for him. We find in the record before us sufficient substantial and competent evidence, if believed, to sustain the trial court's Finding No. III.

The wife assigns as error the making of the trial court's finding of fact No. IV, supra. There is no merit whatever in this assignment. That the parties did on October 22, 1952, at Camp Stoneman, California, execute a property settlement agreement and that pursuant thereto the husband did pay the wife a considerable sum of money stands undisputed in the record before us. Both parties so testified and at the trial, the wife over the husband's objection, introduced such duly executed settlement agreement in evidence.

The agreement, in part, provides: The wife "shall receive all the furniture and all personal effects, including trinkets and personal property which are now in her possession"; that she "shall receive the sum of One Hundred Fifty Dollars ($150.00) per month until such time as the family automobile * * * shall be sold"; that the family automobile shall be sold and that the wife "shall receive the * * * price of the vehicle with the deduction of a One Hundred Nineteen Dollar ($119.00) loan which is the present encumbrance"; that the husband "will pay, or cause to be paid, for the use and benefit of his said wife * * * from and after the month of October 1952, the sum of One Hundred Fifty Dollars ($150.00) per month until such time as the family automobile * * * shall be sold" from which "time on the wife * * * shall receive One Hundred Twenty-Five Dollars ($125.00) per month."

In the property settlement agreement the parties "further mutually stipulated and agreed that if said wife * * * or said husband * * * shall initiate an action for divorce or separation within a court of law, and said decree be legally adjudged by any court, such agreement as entered into on this day shall no longer be binding on either of the parties to this agreement."

As before shown, the husband testified that as a result of the above settlement his wife got all the property that he had.

On her cross examination at the trial held December 22, 1953, the wife testified:

"Q. Now, you have full veteran's benefits, do you not? A. I believe so, sir, but there is a new ruling came out they are only for service connected veterans. * * *

"Q. In addition to that you received $125.00 a month from your husband didn't you? A. Until about three months ago when he stopped paying. * * *

"Q. Now, Mrs. Bissell, you are working at the present time, aren't you? A. Yes, sir.

"Q. Now, Mrs. Bissell, Mr. Bissell sold his automobile in 1952, did he not? A. I think he did.

"Q. And gave you the money? A. No, sir, not all of it.

"Q. How much did he give you? A. He gave me about $500.00; that was in the agreement.

"Q. And that was in the fall of 1952 he gave you that $500.00? A. Yes, sir.

"Q. About what month? A. December."

The wife assigns as error the making of the trial court's conclusion of law No. 2 to the effect that the husband pay to the wife the "sum of $1,250 to be paid at the rate of $50 per month through her Attorney * * * beginning with the date of the entry of judgment." This was not an allowance to the wife for her support within the meaning of R. C. M. 1947, section 21-139. The trial court expressly found in its finding of fact No. IV that "the Defendant has been put to some expense to defend this action." Because of such expense and other outlay, the trial court further found that "the Plaintiff should pay

to the Defendant some money to pay her expenses in the maintenance of the divorce action and in moving from California to Ohio which should be paid by the month.'' The $1,250 which the trial court concluded should be paid to the wife was for these outlays and expenses and was in no sense an award for the wife's support.

Bischoff v. Bischoff, 70 Mont. 503, 226 Pac. 508, and the other cases cited and relied upon by the defendant are readily distinguishable from the instant case both on the facts presented and the law that governs. Such cases are not applicable for here the sums to be paid to the wife were and are for the expenses incurred by her in defending the action and in prosecuting her cross complaint and, under the provisions of R. C. M. 1947, section 21-137, upon timely and proper application therefor made in advance of the performance of the professional services and incurring of the expenses, rested within the discretion of the trial court regardless of whose acts and conduct were responsible for the granting of the divorce. The same is true of the $250 for attorney's fees to enable the wife to pay her counsel for the professional services rendered in the suit.

The trial court determined that the wife was the offender, hence gave its decree for the husband. There is sufficient substantial and competent evidence supporting such conclusion. By necessary implication the court determined that the husband was not the offender for otherwise the wife would have prevailed in the suit and this she did not do.

Notwithstanding that defendant's counsel made no request whatever of the trial court for any findings on any phase of the case he here urges that in its finding of fact No. II, supra, the trial court ''impliedly at least, found that there was recrimination'' and that under the provisions of R. C. M. 1947, section 21-118, divorce must be denied upon such ground. We do not so construe either the finding or the statute.

R. C. M. 1947, section 93-5305, provides: ''No judgment shall be reversed on appeal for want of findings at the instance of any party who, at the close of the evidence and argument in the

cause, shall not have requested findings in writing, and had such request entered in the minutes of the court; nor in cases tried by the court shall the judgment be reversed on appeal for defects in the findings, unless exceptions be made in the court below for a defect in the findings or in a finding."

R.C.M. 1947, section 93-5306, provides: "In cases of exceptions for defective findings, the particular point or issue upon which the party requires a finding to be made, or the particular defect to be remedied, shall be specifically and particularly designated; and upon failure of the court to remedy the alleged defect, the party moving shall be entitled to his exceptions, and the same shall be settled by the judge as in other cases."

R. C. M. 1947, section 93-5307, provides: "Such exceptions shall be filed in the court and served on the attorney of the adverse party within five days after receiving from or giving to the adverse party a written notice of the filing of the findings."

In the record before us we find no compliance whatever with the plain provisions of the above mandatory statutes.

In Bordeaux v. Bordeaux, 32 Mont. 159, 163, 80 Pac. 6, 7, in construing section 1114, Code of Civil Procedure, now R. C. M. 1947, section 93-5305, the court said: "There is in the record no bill of exceptions showing that the defendant, at the close of the evidence and argument in the cause, made written request for findings upon the subject of recrimination, or any other issue, and had the request entered in the minutes of the court, nor that any exception was taken to the action of the court in refusing to make the requested findings, as provided in section 1114 of the Code of Civil Procedure. Under these circumstances the judgment may not be reversed because of any defect in the findings, or any failure on the part of the court to make a finding upon any particular issue (section 1114 [now R. C. M. 1947, section 93-5305]) * * *." The Bordeaux case, 32 Mont. 159, 80 Pac. 6, above quoted, has been repeatedly cited and followed in later cases. See Farwell v. Farwell, 47 Mont. 574, 578, 133 Pac. 958, Ann. Cas. 1915C, 78; City of Helena v. Hale,

38 Mont. 481, 484, 100 Pac. 611; Rogers-Templeton Lumber Co. v. Welch, 56 Mont. 321, 326, 184 Pac. 838. Compare Bilger v. Bilger, 54 Cal. App. (2d) 739, 129 Pac. (2d) 752. See also Bordeaux v. Bordeaux, 43 Mont. 102, 108, 115 Pac. 25.

The record herein fails to show that defendant made any request for any findings in the trial court or that she therein took any exception to any finding made. See Park Saddle Horse Co. v. Cook, 89 Mont. 414, 419, 300 Pac. 242; Mahoney v. Lester, 118 Mont. 551, 168 Pac. (2d) 339; Leake v. Hooten, 88 Mont. 70, 289 Pac. 1043; Nicholson v. Roundup Coal Mining Co., 79 Mont. 358, 368, 257 Pac. 270; Joyce v. McDonald, 51 Mont. 163, 165, 149 Pac. 953; State ex rel. Quintin v. Edwards, 40 Mont. 287, 299, 106 Pac. 695.

Finally the wife contends divorce must be denied upon her showing of recrimination.

''Strictly, recrimination is an affirmative defense which must be specially pleaded or set up in the answer as a defense in order that the defendant may have the right to give proof of such defense.'' 17 Am. Jur., Divorce and Separation, section 325, page 314.

The doctrine of recrimination is that if both parties have a right to divorce, neither party has. The principle is of ancient origin and reaches back to the Mosaic Code and beyond. Read Deuteronomy 22:13-19. Although the Roman law did not allow divorce yet some legal historians trace the rule back to the ''compensation criminum'' of the Roman law relating to property settlements. The ecclesiastical courts of England adopted the principle from the canon law and then injected it into proceedings for separation from bed and board.

It has been said that the doctrine of recrimination rests on the equitable maxim that he who comes into equity must come with clean hands. 27 C. J. S., Divorce, section 67, page 624.

''The maxim is based on conscience and good faith. It is not strictly or primarily a matter of defense, but is invoked on grounds of public policy and for the protection of the integrity of the court.'' 30 C. J. S., Equity, section 93, page 477.

"Important developments of the past several decades have made it increasingly clear that the courts can no longer decline to exercise the discretion inherent in the clean hands doctrine." So said the Supreme Court of California in the recent case of De Burgh v. De Burgh, 39 Cal. (2d) 858, 867, 250 Pac. (2d) 598, at page 603, as it proceeded to recognize and sanction the right of the trial judge, in the exercise of a sound discretion, to grant divorce even though both parties have been shown guilty of such misconduct as constitutes grounds for divorce. Also see Mueller v. Mueller, Cal. App., 276 Pac. (2d) 693.

When the record clearly shows "the legitimate objects of the marriage have been destroyed" then the parties are entitled to have the marriage dissolved. As was said in Phillips v. Phillips, 41 Cal. (2d) 869, 264 Pac. (2d) 926, 931: "No public policy would be served by denying a divorce because each party was guilty of extreme cruelty toward the other. It is a degradation of marriage and a frustration of its purposes to use it as a means of punishing the parties to the divorce action. In our opinion, the trial judge should not have denied the parties a divorce on the ground that recrimination had been shown."

In Hendricks v. Hendricks, 125 Cal. App. (2d) 239, 270 Pac. (2d) 80, at page 82, the court said:

"It is fundamental that a marriage contract differs from other contractual relations in that there exists a definite and vital public interest in reference to the marriage relation. The 'paramount interests of the community at large', quoting from the Phillips case, supra [cited above], is a matter of primary concern. The instant case presents a picture of long continued strife * * *. Public policy cannot well be served by denying a divorce to both parties. Since both parties are, under the evidence, entitled to a divorce on the ground of cruelty, they should be granted that relief without further litigation."

The statute in Montana provides that a divorce "must be denied upon showing: * * * Recrimination." R. C. M. 1947, section 21-118.

"Recrimination is a showing by the defendant of any cause

of divorce against the plaintiff, in bar of the plaintiff's cause of divorce." R. C. M. 1947, section 21-128.

The California and the Idaho statutes on recrimination are the same as ours.

In Howay v. Howay, 74 Idaho 492, 264 Pac. (2d) 691, 694, 695, which has our unqualified approval, the court said:

"The doctrine of recrimination is said to be based upon the equitable precept that he who comes into equity must come with clean hands. But it cannot be compared to that precept if it must be applied mandatorily by the divorce court in every case where improper conduct on the part of the plaintiff appears, without regard to consequences or other considerations having an equal claim upon the conscience of the chancellor. Equity has always regarded itself free to apply or refuse to apply the maxim in a particular case, depending upon the consequences and a due regard for other considerations involved.

" 'The clean hands maxim has its limitations. It does not operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act of a party. * * * equity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject matter of the suit and to defendant.' 30 C. J. S., Equity, section 98.

"In Stewart v. Stewart, 158 Fla. 326, 29 So. (2d) 247, 248, 170 A. L. R. 1073, where the misconduct of both parties was established * * * the court referring to recrimination said:

" 'It is not an absolute but a qualifying doctrine. If it were to be applied strictly great inequity would be done, for it so often happens that neither party to a suit has been free from fault. * * *

" 'The principle is most applicable when a party seeks to take advantage of an act or omission which he has himself induced.'

"The annotation to the Stewart case, 170 A. L. R. 1076, calls attention to the trend toward relaxation of the doctrine of recrimination and the underlying reasons prompting the courts to take that course. The trend which the annotator said was not

'marked' at that time, 1946, has since had considerable expansion. * * *

" 'To affirm that a guilty spouse is never entitled to a divorce is a position difficult to apply to the facts of life. It is seldom, perhaps never, that any wholly innocent party seeks a divorce against one who is wholly guilty. Awareness of this fact and the giving of attention to the social implications of divorce has given rise to various exceptions and limitations on the doctrine of recrimination.' Hendricks v. Hendricks, Utah, 257 Pac. (2d) 366. * * *

"In some jurisdictions divorce is granted to both parties. Flagg v. Flagg, 192 Wash. 679, 74 Pac. (2d) 189; Simmons v. Simmons, 122 Fla. 325, 165 So. 45; Burch v. Burch, 3 Cir., 195 F. (2d) 799.

"The opinion in Burch v. Burch, supra, contains an excellent review of decisions involving recrimination. We quote:

" 'The doctrine of recrimination has been rested upon the equitable maxim that he who comes into equity must do so with clean hands, upon the doctrine that divorce is a remedy for an injured spouse, not for a guilty one, and upon the contract theory that he who seeks redress for the violation of a contract resting on mutual and dependent covenants must himself have performed the obligations on his part. But the doctrine of recrimination in divorce has been much criticized in recent years. For it ignores the fact that marriage is not a mere private contract but rather a status of such basic importance in the social structure that the state has a vital interest in its proper continuance and appropriate termination. From a social point of view it is hard to defend the rule that recrimination is an absolute bar to the granting of a divorce for it requires that parties who are guilty of conduct which makes their marriage impossible of success shall continue their impossible marital relationship as a sort of punishment for their mutual guilt. For this reason the application of the doctrine has been relaxed as an absolute bar to divorce in a number of jurisdictions.' At page 809, of 195 F. (2d)."

The Howay case, supra, 265 Pac. (2d) at pages 695-697, continues:

"Our statute on recrimination appears to be mandatory in its terms except for the phrase 'in bar of the plaintiff's cause of divorce.' If by this the legislature left to the court the determination of when a recriminatory defense is established so as to bar plaintiff's right to a divorce, then recrimination, like clean hands, and the mutual dependent covenants of contract doctrine, would allow equity to have regard for the public interest and the consequences to the parties and others in its application. * * *

"It is unnecessary for us here to adopt any so-called rule of 'compartive rectitude', or to go to the extent that the California court did in the De Burgh case [cited above]. Here the question is squarely presented as to whether or not the acts and conduct of the plaintiff were such as to require the district judge to conclude that a cause of divorce was established in the defendant. While it is true that, standing alone, the court may have concluded that a cause was thus shown, he was not required by the facts to do so."

In Hendricks v. Hendricks, Utah, 257 Pac. (2d) 366, 367, it is said:

"The factual background of this case reveals circumstances which often lead to domestic distress and end in the divorce court. * * *

"The court, counsel and the parties all seem to agree that this marriage is hopelessly on the rocks; that the marriage relationship has become so intolerable that both would be happier, if they were free to go their separate ways. * * *

"The principle that a divorce will ordinarily not be granted where both parties are at fault is of ancient origin and has long persisted, although in modern times it is probably true that it has been more honored in the breach than in the observance. There are undoubtedly some circumstances, such as mutual conviction of a felony, adultery or other serious offenses which may justify a court of equity in refusing to grant either party

relief. Whether this be regarded as recrimination or an application of the basic precept that one who seeks redress for violation of a contract resting upon mutual covenants must have performed his own, or merely of the 'clean hands' doctrine of equity is of no importance here. * * *

"A realistic approach to it is indicated by the court in the case of Dearth v. Dearth [141 Pa. Super. 344, 15 A.2d 37], wherein it concluded that where mutual delinquencies of husband and wife made further living together intolerable, a divorce should be granted and the court was not called upon to balance such delinquencies but only to determine which party was least at fault in causing the bad situation. This is based upon the doctrine of 'comparative rectitude' which is often used and has been given tacit recognition by this court. Although some statutes specify that a divorce may be granted to 'the party not in fault' our statute wisely contains no such provision. Our policy has been to take consideration of the practical exigencies of such situations, and in cases such as the instant one, where both are at fault, approve the granting of a divorce to the one least to blame.

"From anything that appears in the instant case, no good purpose either social, moral, ethical or legal could be served by refusing to grant a divorce and settle the property rights of the parties. It would be but a mockery of the true concept of matrimony to thus purport to compel these two people, clearly ill-suited and maladjusted to each other to continue to retain the legal relationship of husband and wife.

"In view of the fact that neither spouse is accused of the commission of a felony, adultery or any other heinous offense but the reciprocal claims rest upon various acts and omissions alleged to constitute cruelty to the other, the trial court would best perform its function in the administration of justice by determining which party was least at fault, granting a divorce and adjusting their rights, giving due consideration to the applicable factors outlined in our recent opinion of McDonald v. McDonald [Utah, 236 Pac. (2d) 1066]."

In Bressie v. Bressie, Mo. App., 266 S. W. (2d) 24, at page 27, it is said:

"It is also contended that there was no proof that Bressie was the innocent and injured party. It is true that he struck defendant on the day of the separation, but he was apparently goaded to exasperation by her assertions that the marriage of twenty years was in fact a nullity and her further statement that she desired to be single. We have repeatedly held that the term 'innocent and injured party' does not mean a party without fault."

In Saunders v. Saunders, 140 Conn. 140, 98 A. (2d) 815, 817, it is said:

"A divorce is, of course, not to be denied a party merely because his or her conduct appears to the court to deserve censure."

In Boter v. Boter, 338 Mich. 187, 61 N. W. (2d) 64, 65, it is said:

"It is true, as defendant claims, that neither party was entirely blameless. But we have held that where the acts of cruelty on the part of one party are so far greater than those of the other, the latter is entitled to a divorce."

Vincent v. Vincent, 208 Okl. 470, 257 Pac. (2d) 512, at page 515, holds that a divorce may be granted in the court's discretion although the parties are in equal wrong.

In Hensley v. Hensley, 213 Ark. 755, 212 S. W. (2d) 551, the appellate court held that where the evidence established that conditions between the husband and wife were unbearable and there was no hope of amelioration and that the conduct of the husband was chiefly responsible, the wife was entitled to a divorce notwithstanding she was not without fault.

In McFadden v. McFadden, Tex. Civ. App., 213 S. W. (2d) 71, at page 74, the appellate court said:

"The doctrine of recrimination is observed in a number of jurisdictions in this country and, under it, where it is shown in divorce cases that both parties have been guilty of cruel treatment, a divorce will not be granted. It is now well settled however, that in this state, as well as a number of others, the

rule is relaxed and that of comparative rectitude is recognized. In such cases the court has the duty of weighing the conduct of the respective parties and is authorized to grant a divorce to the one who is lesser guilty.''

In Fritz v. Fritz, 179 Or. 612, 174 Pac. (2d) 169, at page 173, the court said:

''In divorce proceedings relief is not invariably denied when the record discloses that neither party is entirely free from fault.''

In Thompson v. Thompson, 82 U. S. App. D. C. 325, 164 F. (2d) 705, at page 706, the appellate court said: ''Appellant contends that since the appellee was guilty of misconduct, he should have been denied relief. We held in Vanderhuff v. Vanderhuff [79 U. S. App. D. C. 153, 144 F. (2d) 509] that recrimination is not an absolute bar to a divorce. We pointed out, however, that special circumstances might exist where this defense would be relevant in a determination as to which party was entitled to a divorce in a case where both sought a decree, and so evidence as to appellee's misconduct was relevant here. The court admitted it, and the record shows that it was carefully considered. The court had before it the complaint, the cross complaint, and all the evidence which either party cared to present. It reached the conclusion which eventuated in the judgment for the husband. There is nothing in the record to indicate that this conclusion was erroneous as a matter of law.'' Compare Pavletich v. Pavleitch, 50 N. M. 224, 174 Pac. (2d) 826; Stewart v. Stewart, 158 Fla. 326, 29 So. (2d) 247, 170 A. L. R. 1073, and Burch v. Burch, 3 Cir., 195 F. (2d) 799.

The judgment of the trial court is affirmed.

MR. JUSTICE BOTTOMLY, concurs.

MR. JUSTICES ANGSTMAN and ANDERSON:

We concur in the result reached in the opinion of Mr. Chief Justice Adair but not with all that is said in it.

We think there is no question of recrimination in this case

since there is sufficient evidence to sustain the trial court's finding that the wife and not the husband was the offender. That conclusion in our opinion takes the question of recrimination out of this case.

Finding of fact No. II is not inconsistent with the implied finding that the wife and not the husband was the offender.

MR. JUSTICE DAVIS, dissents.