174 P.2d 826

**PAVLETICH v. PAVLETICH et al.**

No. 4929.

Supreme Court of New Mexico.

Nov. 26, 1946.

1231

Robert A. Morrow, of Raton, for appellant.

Fred C. Stringfellow, of Raton, for plaintiff appellee.

Daniel W. Caldwell, of Springer, for cross-defendant appellee.

HUDSPETH, Justice.

On the 9th of April, 1942, appellee filed suit for divorce. Appellant, on the 26th of February, 1945, filed her amended and supplemental answer and cross-complaint denying material allegations of the complaint and raising the doctrine of recrimination. She charged that appellee committed adultery and lived with Lucille Worrell, whom she made cross-defendant. She also alleged that certain property standing in the name of Lucille Worrell was community property of appellant and appellee. Issues were joined and the case was tried to the court without a jury. Decree adjudging the title of all the property in controversy in cross-defendant, granting appellee a divorce on the ground of incompatibility, and dismissing the cross-complaint of appellant was entered the 26th day of April, 1945. Defendant and cross-complainant appeals.

A great deal of testimony in the 336 page transcript relates to the ownership of the property in controversy. The Court found:

"11. That the cross-defendant, Lucille Worrell, commenced the operation of the premises known as 'Club 85' at Springer, Colfax County, New Mexico, on or about the 1st day of July, 1940 and that ever since that time she has operated the said club and paid all taxes and other expenses in connection with the operation of said club and that the license for the operation of said club has been in her name and that Nick Pavletich did not have any interest in said club as owner since July 1, 1940.

"12. That the premises known as 'Nick's Club 85' was taken over by R. E. Adams on or about the 25th day of April, 1940, and that R. E. Adams is the present owner of said premises; that on or about July 1, 1940, the building was leased by said R. E. Adams to Lucille Worrell for an agreed rental of $50.00 per month and that she has continued to lease said building and pay said rent since that time; that Nick Pavletich did not have any interest in such building since it was taken over by R. E. Adams on or about April 25, 1940.

"13. That since the 1st day of July, 1940 Nick Pavletich has been employed to work as a bartender and manager of the premises known as 'Club 85' owned and operated by Lucille Worrell.

"14. That there was no fraud, collusion or conspiracy practiced by and between Nick Pavletich and the cross-defendant to

conceal the property of Nick Pavletich; that all loans and purchases made in the name of Lucille Worrell were made with money belonging to Lucille Worrell and that Nick Pavletich has no interest therein.

"15. That the Club 85 located near Springer, Colfax County, New Mexico, and all property used in connection therewith is the sole and separate property of Lucille Worrell; that all property described in paragraph 9 of defendant's Amended and Supplemental Answer is the sole and separate property of Lucille Worrell, and that the plaintiff and defendant own only the community property specifically described herein in paragraph 8 hereof."

Appellant maintains: "The court should have decreed that Club 85 and any profits from its operations, or any property into which such profits were invested, was the community property of appellant and appellee."

It appears that plaintiff-appellee, a coal miner, left the mines, after suffering a physical injury, a number of years ago and thereafter engaged in business. His several small business ventures seem to have been financial failures. He built "Nick's Club 85," a saloon and dance-hall, in the year 1939, and ran the place for several months. On or about July 1, 1940, the business was transferred to Lucille Worrell.

Appellant's counsel, in his excellent brief, referring to plaintiff's financial condition at that time, says:

"Appellee was insolvent. His place at Eagle Nest had been sold on mechanic's lien foreclosure January 4, 1940 in a suit by R. E. Adams. Appellee had turned the building in which Club 85 was operated over to Mr. Adams because Appellee could not pay the material bills against it. While thus involved and while the litigations above mentioned were pending, appellee sold Club 85 to cross defendant on July 1, 1940. It is evident that this sale, or pretended sale, was made at that particular time in order to place the property beyond the reach of creditors and beyond the reach of appellant on her claim for alimony, both in the future and the $245.00 which was delinquent, * * *"

Plaintiff-appellee, in addition to being insolvent, was confronted with contempt proceedings because of his failure to meet alimony payments due appellant under an order made in a suit for separate maintenance brought by appellant in the year 1938. Appellee had little to sell. The fixtures were mortgaged, and there is no evidence that the small stock of merchandise and the equity in the fixtures which appellee testified he sold to the cross-defendant, Worrell, were worth more than the purchase price. Cross-defendant borrowed money about the time of the purchase.

"Club 85" had not been a business success, and the profits of her business were quite small for the first year or two. She testified that she built up the business and profits were much larger thereafter.

The trial court in his opinion says:

"I appreciate the fact that Mr. Morrow has done a very thorough and excellent job in attempting to show fraud and collusion between Mrs. Worrell and Mr. Pavletich, but I think the intimation which he has made that Mr. Pavletich and Mrs. Worrell conspired to get the Club 85 in Mrs. Worrell's name for both their benefits has been strongly belied by the testimony of Mr. Adams. I think his testimony is worth considerable weight in this case because of the fact he is essentially a disinterested party who has nothing to gain one way or the other by a decision in this case. He is president of a couple of banks and a lumber yard, and so far as I can determine has no reason to be biased or prejudiced in his testimony. In his testimony he stated he might have been hard on Nick, but he took the place away from him. * * * I cannot see that the acquisition by Mrs. Worrell could have been in any way a preconceived plan. I think the evidence primarily shows that Mr. Adams, as he stated on the stand, didn't have much faith in Nick, * * *"

Appellee, on his own account, acted as livestock broker, and bought and sold cattle. He had a bank account, in which he deposited $39,597.97 from January 1940 to March 17, 1945, but the trial court found that these deposits were not income from Club 85, but money that passed through appellee's hands as the results of various cattle dealings, and the buying of cattle for others, "the money remaining in said account for only a short period of time." Appellant proved that approximately one-tenth of the bills of wholesale liquor dealers for liquor furnished Club 85 after July 1, 1940, were paid by checks on this bank account; that the sign on the club had not been changed; that some accounts for goods furnished Club 85 continued to be carried in the name of appellee; that in the negotiation for the purchase of property appellee did not disclose that he was acting for cross-defendant until final papers were drawn; that appellee negotiated for the lease and sale of this purchased property as if it belonged to him (but not in the presence of cross-defendant) and other incidents to which appellant points as badges of fraud. And members of appellee's family testified that he had stated that he owned the Nicholson Place and other property in controversy purchased after cross-defendant took over Club 85.

On the other hand, appellee and cross-defendant testified that appellee started working for cross-defendant July 1, 1940, as bartender and manager of Club 85 at a

salary of $125 per month and all expenses—later increased to $135 per month; that appellee was reimbursed for money advanced in her absence and used in payment of bills of Club 85, and, generally, offered satisfactory explanations—if their testimony is to be believed—of the suspicious circumstances shown by witnesses for appellant. However, appellant strenuously argues that they are not credible witnesses, and that there is not substantial evidence to support the findings of the court.

The salary of appellee was less than the pay of a good coal miner at that period. But appellee testified that he could not get a job in the mines because he could not pass the physical examination. There is little evidence in the record of his earning capacity. Appellee was insolvent, and could not obtain a lease of Club 85, and apparently had reached the end of his rope, so far as that property was concerned. Appellant requested the trial court to conclude:

"That Lucille Worrell should be compelled to transfer the business known as Club 85 or Nick's Club 85 to plaintiff and defendant, and account for all moneys derived from the operation of said business, and that such business and the moneys derived therefrom are community property of plaintiff and defendant."

■ The first question for the trial court's consideration was whether or not things were what they seemed on July 1, 1940—whether the ownership of Club 85 was in the cross-defendant. So far as the record shows the cross-defendant had paid full value for what she received. We held in National Mut. Savings & Loan Ass'n v. Lake et al., 47 N.M. 223, 141 P.2d 188 (Syl.):

"Conveyance made on full consideration was supported by presumption of honesty and legality which attends actions of men until contrary is clearly shown."

■ Viewing the matter from the standpoint of the cross-defendant, it appears that she had decided to chance her small capital and credit in a business yet to be proven profitable. The trial court decided that she had sufficient judgment to act at that time as a businessman would have acted; that is, in her own interest, and acquired the property in fact as well as in name. The other theory is that she is a foolish woman and contributed her savings, credit and services for five years to appellee, and lent him her name for the purpose of carrying on the business. This is the crucial question in the case so far as the property is concerned. If she owned the business all the net profits, of course, were hers. It is the duty of the trier of facts to weigh the evidence and determine the witness's credibility. Rice v. First National Bank in Albuquerque, 50 N.M. 99, 171 P.2d 318. Every presumption is indulged in favor of the correctness of the

judgment, if there is substantial evidence to support the decision. Consolidated Placers, Inc., v. Grant, 48 N.M. 340, 151 P.2d 48.

When the trial court resolved the question of the ownership of Club 85 he practically decided the other questions relating to property, since it is the theory of appellant that appellee acquired the Nicholson Place, the Smith Place, and notes with the profits of Club 85. Appellee's salary was largely consumed in the payment of alimony to appellant, which was never less than $100 per month. The money with which these properties were acquired was evidently furnished by cross-defendant in whose name the titles were taken.

We are constrained to hold that the judgment in favor of cross defendant is supported by substantial evidence, and must, therefore, be affirmed.

The appellee and appellant intermarried in the year 1917, and separated in May, 1937. They had four children, at the time of the trial, the oldest was twenty-four years of age and the youngest nineteen years of age, all self-supporting. The court granted appellee a divorce on the ground of incompatibility, and ordered him to pay appellant alimony in the sum of $100 per month. The court found:

"4. That for a long time prior to the filing of the complaint herein, and for approximately seven years prior to the 15th day of May, 1937, the home conditions of the parties heretofore were insufferable and that the parties hereto are incompatible and incapable of harmonious cohabitation or coexistence and at this time the parties hereto are so incompatible as to make cohabitation and coexistence and the performance of marital duties impractical and impossible, and that the parties hereto at this time are irreconcilable."

These findings, including the finding that the parties are irreconcilable, are supported by substantial evidence—much of it sordid—which it is unnecessary to set out here.

Trial court in his opinion said:

"At this time I may as well state that I do not intend to make a finding of adultery, because I do not believe that adultery existing after a separation and state of incompatibility, with the parties living separate and apart, is material to the decision of the court in granting a divorce; and, in the event this case goes to the Supreme Court, I would state now that whether or not the Supreme Court feels that there is sufficient ground to make a finding of adultery, if I made a finding of adultery in this case, after the separation, I would nevertheless conclude as a matter of law that the plaintiff was entitled to a divorce on the ground of incompatibility, and I feel this is in line with the Poteet case and it is the proper stand to take in the interest of the public

welfare,—I think that is the theory behind the Poteet case. I cannot feel that when parties are living separate and apart, and one or the other, or both are guilty of adultery, that the courts can serve any good purpose by forcing them to live for the rest of their lives as husband and wife, separate and apart, and thereby create a situation which can do nothing but cause sorrow and unhappiness, and an intolerable moral situation as long as those parties live and are physically capable of the sexual act; and I take that position in the face of the Chavez case, which says, more or less, if both parties are guilty a court shall hold them together whether they want to live together or ever intend to live together again. I think it is a cruel and inhuman law, if such is the law, and I do not believe it is the law of New Mexico at the present time and I think the Justices who decided the Poteet case will agree with this principle.

"The reason I have stated that I will make no finding on adultery even if the Supreme Court should decide the evidence was so strong that it would necessitate such a finding, is I believe it is immaterial and I do not see the necessity of making a public record of such a finding, and I do not believe it is necessary to the issues in this case."

The views of the people and courts of the world on recrimination as a bar to divorce are slowly changing. In England, since 1857, the court has not been bound to deny a divorce to a petitioner guilty of adultery (Reddington v. Reddington, 317 Mass. 760, 59 N.E.2d 775, page 777 note, 159 A.L.R. 1448) and in France under the law passed in July, 1884, the Supreme Court of Appeals has abandoned to the lower courts the final evaluation of the injures graves. 28 Iowa L. Review p. 301. And of Sweden, Germany and Russia the following appears in an article entitled "Divorce Without Fault," 29 Iowa Law Review, p. 526:

"The striking contracts between the liberal and socialistic idea of the Swedish law, the anarchistic element of the Russian law, and the hyper-etatistic ideology of the German legislation, is undeniable. In spite of these intellectual and political differences, the idea of factual marriage and divorce without fault prevails in the three countries. * * *

"The importance of the fault principle is thus reduced, from a logical viewpoint, to nothingness, from a practical viewpoint, to a minimum. It could in itself be considered only in cases in which the State is absolutely disinterested. But are there such cases at all in a totalitarian State? * * *

"Nowhere is the justification for such a change of attitude more obvious than in the law of divorce. The psychology of marriage is less accessible to the judge than that of other domains of the law. Agenor Krafft's words are well in point: '* * *

Is it really believed that spouses who have engaged in litigation, sometimes for years, are going to take up their marital relationship because seven federal judges have decided, sometimes in a few minutes, that they ought to try again, that it was not proved, etc. * * *' And yet, countries which refuse to impose a business partnership on an unwilling party, do not hesitate to impose on unwilling spouses this most intimate of human relations."

There seems to be a change in our own country as evidenced by the act of Congress, D. C. Code 1940, Sec. 16—403. In Vanderhuff v. Vanderhuff, 79 U.S.App.D.C. 153, 144 F.2d 509, the United States Court of Appeals, District of Columbia, said:

"From a social point of view it is hard to defend a rule that recrimination is an absolute bar to the granting of a divorce. It requires parties who are guilty of conduct which makes their marriage impossible of success to continue their marital relationship as a sort of punishment for their sins. Nevertheless, under our former divorce statute it was apparent that Congress had expressed just such a public policy. The only ground for divorce under that statute was adultery. It was further provided that the guilty party should not remarry. This indicated the clear intent to prevent a spouse who was guilty of adultery from being free from the consequences of a former marriage.

"We believe our present statute has changed the policy which made recrimination an absolute bar to divorce."

In Volume 10, Kansas City Law Review, page 213, there is an article by J. G. Beamer entitled: "The Doctrine of Recrimination in Divorce Proceedings," in which he says:

"Recrimination is one of four bars to a divorce action conjured up first from Roman property law by 12th Century canonists in order that the Church might intervene in a divorce suit which, if successful, would have turned a wife loose on a society in which unattached women had no place. Today it is a legal foil, furnished to the defendant by the 'common law' or statute, by means of which he can admit even the most repellent charges made in the complaint and still prevent the plaintiff from securing a divorce. * * *

"Three possible sociological justifications for the doctrine of recrimination can be dimly discerned behind the empty incantations with which the courts rationalize its existence and application to the cases before them. The first is that it tends to hold the family together; the second, that it serves as a check upon immorality; the third, that it protects the property rights of the wife.

"The family is still the fundamental sociological unit of our civilization. For the purposes of this discussion, it is assumed

that it should be preserved and that the state has a vital interest in its preservation.

"In its largest aspect the problem involved here is whether divorce, under any circumstances, should be permitted. Fortunately, we need not attempt an answer. For our limited purposes the question has already been answered. Forty-seven out of the forty-eight of our state governments, and a respectable majority of foreign governments all of whom, it is assumed, have a vital interest in the maintenance of the family—have decided that the interests of both the family and of the state can best be served by permitting divorce in certain situations. And the present tendency seems to be toward a further liberalization of the divorce laws. This decision and tendency may be said to be due to a slowly awakening realization that denial of divorce seldom restores life to families sociologically dead when they come into court, and that if anything is preserved it is but the dead and empty shell of what has been and is no longer—a realization that upon the refusal of divorce, those things which cannot be done legally are often done illegally, those which cannot be done openly are done clandestinely; that other relationships are formed, nameless children born; and that even if the parties force themselves to remain together, their children probably will not thank them for it or even be imbued with any high and lasting ideals about their family, or the family as a sociological concept.

"If this is the justification for permitting divorce where only one party is at fault, how much more reasonable is it to permit divorce where both parties hold their marriage vows in contempt, and the likelihood that attempts at reconciliation will fail are thereby doubled. Possibly at one time—when a party convicted of adultery was prohibited from marrying again—a distinction could be made. But if so, it is no longer valid today. With a few limitations, the defendant as well as the successful petitioner is permitted to remarry and possibly achieve the happiness he failed to find in his first marriage.

"This pursuit of happiness is natural in man and it is desirable that it take place within the law rather than outside. The guilt or innocence of the other spouse should be immaterial. Indeed, one may well ask whether there is such a thing as an innocent spouse—especially in those states where numerous grounds for divorce are provided. It is difficult to understand, for instance, how a divorce can be granted on such a reciprocal ground as incompatibility without the plaintiff being just as incompatible as the defendant. Permitting a divorce on this ground would seem to indicate a legislative intent to abolish the doctrine of recrimination, but, unfortunately, it has been held otherwise. The result

is that the artificial distinction made between those cases where both parties are proven guilty of some marital misconduct, and the cases where the guilt of only one party can be established is retained—to the detriment of the parties, the family, and the state.

"Perhaps the solution to the problem of divorce, as many writers upon the subject have suggested, lies in preventive rather than curative legal processes. To be successful, such programs require not only cooperation and understanding between the court, the social worker, the doctor and psychologist, but also that the court and its aid have the complete confidence of the parties themselves. This confidence will not be given so long as the parties are afraid that they might be denied relief— even though a divorce is advised by the court's aids—if the parties reveal too much. Far-sighted programs of this sort do not envisage a dime-novel demarcation of hero and villain, and the advance in sociological treatment which they make possible is destroyed if such melodramatic mummery is insisted upon in the trial or appellate courts. * * *

"Finally, the doctrine of recrimination, as outlined by the appellate courts, does not obtain in actual practice. It is common knowledge that most divorce suits are not contested, and that in the few which are, recrimination is seldom mentioned.

The result is that our divorce courts operate upon unsound foundations, contempt for the law and for the courts is bred in the minds of the people, the parties themselves are forced to conceal matters which should be decided by an impartial tribunal, and a petty form of blackmail is encouraged."

In Poteet v. Poteet, 45 N.M. 214, 114 P.2d 91, 96, the court, speaking through Mr. Justice Bickley, reviewed the legislation and decisions of this commonwealth, on divorce, and many of the authorities on recrimination as a bar to divorce. In speaking of incompatibility as a ground for divorce, we said:

"We have no doubt the District Judges understand the wide signification of the word and will apply it understandingly to the facts of a particular case. Some of the lexicographers give 'irreconcilableness' as a synonym. We venture the suggestion that this is an important factor to be considered in granting or refusing divorces upon the ground of incompatibility."

█ If the chancellor believes the parties are reconcilable, he will, no doubt, endeavor to bring about a reconciliation. But where the parties are irreconcilable we believe that the public policy of this state as expressed by the legislature, is against denying a divorce on the doctrine of recrimination. Chavez v. Chavez, 39 N.M. 480, 50 P.2d 264, 101 A.L.R. 635, in so far as it holds it to be the imperative duty of

the chancellor to deny a divorce upon a showing of recrimination, should no longer be followed.

■ The trial court, therefore, correctly ruled that the question of the adultery of appellee was immaterial. Finding no error in the record, the judgment and decree of the trial court is affirmed.

It is so ordered.

BICKLEY, BRICE and LUJAN, JJ., concur.

SADLER, Chief Justice (dissenting).

When the legislature added incompatibility as a ground for divorce to those already named in the statute, it greatly facilitated the ease with which a divorce from the bonds of matrimony may be secured. Indeed, in practical application statutory authority to procure a divorce upon this ground brings us to the very border, if not into the actual domain, of trial marriage. Nevertheless, wisdom of the policy which authorizes divorce on this ground is for the legislature, not this Court, to decide.

My objection to the prevailing opinion is that it pioneers the subject of divorce beyond anything attempted by the legislature itself. Recrimination as a defense to a bill for divorce came to us with our adoption of the common law in 1876 and as a part of that law. L.1875–1876, c. 2, § 2,

1941 Comp., § 19-303. The statute on incompatibility says nothing about doing away with recrimination as a defense. Under the weight of authority, it exists as such except where denied by express statutory enactment. 17 Am.Jur. 267 and 27 C. J.S., Divorce, § 67, p. 623. As a part of the common law its repeal should rest on express statutory or constitutional declaration or arise by necessary implication. 15 C.J.S., Common Law, § 12, p. 619; Ickes v. Brimhall, 42 N.M. 412, 79 P.2d 942. Here there is neither.

Indeed, in Chavez v. Chavez, 39 N.M. 480, 50 P.2d 264, 101 A.L.R. 635, decided since adoption of the incompatibility statute, we expressly upheld recrimination as a defense to a plea for divorce, reaffirming the correctness of that decision a few years later in Tenorio v. Tenorio, 44 N.M. 89, 105, 98 P.2d 838, 848, in language, as follows:

"It is argued under another claim of error that 'recrimination is not a defense to divorce in this state'. But it is, unless the court wishes to overrule Chavez v. Chavez, 39 N.M. 480, 50 P.2d 264, 101 A.L.R. 635, and it is not now so disposed."

We expressly declined to pass upon the question in Poteet v. Poteet, 45 N.M. 214, 114 P.2d 91, 96, in stating: "We need not now decide whether recrimination is a defense in a divorce action." We already had held that it is in the Chavez and Tenorio cases a short time before.

The far reaching effect of today's holding on the law of marriage and divorce in New Mexico is easy to see. The statutes authorize divorce on ten separate grounds. 1941 Comp., §§ 25-701 and 25-710. Incompatibility is one of the ten and came in along with incurable insanity, in 1933. L. 1933, c. 54, § 1; L.1933, c. 27, § 1. Thus it is that incompatibility, latest to arrive as a ground of divorce, if freely employed, will eliminate all others save possibly incurable insanity as a basis for divorce, by giving it into the hands of the chancellor to ignore the defense of recrimination and award a divorce, if so moved by the irreconcilable nature of the family differences, even though the incompatibility found may have arisen over the commission by one of the spouses of a capital sin of the marriage relation. It is doubtful if the legislature enacting the statute ever visualized that such a possibility could result therefrom.

In my opinion, the trial court erred in declining to entertain the defense of recrimination. Its decree should be reversed and the cause remanded for a new trial at which the issues on the defense of recrimination shall be found and a decree entered conformably thereto. The majority concluding otherwise, I dissent.