**Betty AZAR, Appellant,**

v.

**James J. AZAR, Respondent.**

No. 7892

Supreme Court of North Dakota.

Nov. 27, 1961.

**2**

Higgins & Murphy, Bismarck, for appellant.

Zuger, Zuger & Pearson, Bismarck, for respondent.

BURKE, Judge.

In this case the plaintiff, wife, sued the defendant, husband, for divorce. She asked for the custody of the children of the marriage and for an allowance for the support of herself and children. As a ground for divorce plaintiff alleged extreme cruelty. The defendant denied plaintiff's allegations of extreme cruelty and by counterclaim asked for a divorce and the custody of the children. He alleged extreme cruelty on the part of the plaintiff. The case was tried piecemeal over a period of 15 months. There were hearings on March 10, 1958, July 21, 1958, April 27, 1959 and June 5, 1959. Judgment was entered August 12, 1959, granting a divorce to the defendant and awarding the custody of the children of the marriage to their Aunt Angeline Azar. No allowance whatever was made to the plaintiff either by way of property settlement or alimony. Plaintiff has appealed from the judgment and demanded a trial de novo in this court.

Defendant is the owner (subject to a large encumbrance) and operator of a motel in Bismarck. He first met the plaintiff when she and two other women were guests at the motel. One of these women was a Betty B. Plaintiff and Betty B. moved from the motel to a home on South Bowen Street in Bismarck where they lived for several months during which time defendant and plaintiff saw little of each other because, according to defendant, she didn't show any interest in him and he was quite busy with his gambling. Finally, they did start going together. At Christmastime 1954, they took a trip to South Dakota with the intention of getting married. For some reason not explained by the record, they did not go through with their plans, and returned to Bismarck. They were married February 12, 1955, Jana Jo, their first daughter, was born September 12, 1955, and April, the second daughter, on April 10, 1957.

The specific acts of cruelty charged by the plaintiff fall into three categories. The first relates to what is termed in the complaint as "an almost pathological jealousy" of all of the plaintiff's friends and of one Betty B. in particular. The second relates to defendant's excessive gambling for high stakes and the financial difficulties caused by his losses. The third relates to actual physical beatings, to threats of physical violence and to harassment by constant surveillance after she had left the family home.

There is no question about defendant's objection to Betty B.'s association with his

wife. Although he knew she was perhaps his wife's closest friend, he told her, at the very commencement of their marriage that he wanted the friendship and association terminated. Plaintiff, however, testified that defendant's objections included all of her friends. She stated, "Anybody I became friendly with he objected to * * *. And soon I had no friends or anybody I could associate with." She also said that the objections included friends to whom defendant introduced her. She cited two specific instances in which defendant took positive action to break up these friendships. On one occasion he told his wife she had been seeing too much of a certain woman, called the woman on the telephone and told her that "she was not to come out any more." In another instance he ordered another woman from the premises. He swore at her and told her to get out. Neither of these incidents is denied by defendant. In these instances defendant could not justify his conduct upon the ground that the women were not fit associates for his wife because he had introduced them to her in the first place. He does attempt to justify his objections to Betty B. upon the ground that she was a person of unsavory character and reputation. The testimony of the defendant is filled with innuendos and insinuations to that effect but there is no testimony in the record to support the insinuations which has legal probative value. It was established that defendant wrote to all of Betty B.'s relatives to inform them that she had had an illegitimate child which had been placed for adoption but there was no proof as to whether this bit of malicious gossip was true or false.

In so far as the charges of gambling are concerned, they are admitted by the defendant. Defendant urges, however, that plaintiff should not be heard to complain of the gambling because she knew he gambled before they were married and also because she accepted expensive presents he occasionally bought her when he won. Plaintiff admitted that she knew he gambled but that she had no idea as to the extent of the gambling or of the amount of money involved. She had no moral compunctions against gambling. Her objections were purely practical in character. Because of it, defendant neglected his business, lost large sums of money, incurred a large indebtedness and endangered the only means of livelihood that the family had. She testified that defendant lost large sums of money at Las Vegas while they were on their honeymoon; that during the winter of 1956, he went to Williston for the purpose of gambling almost every weekend; that he gambled regularly downtown in Bismarck, and made many trips to Dickinson for that purpose. On January 1, 1957, he flew to Las Vegas, Nevada solely for the purpose of gambling; that he lost large sums of money and that he received many letters from clubs and collectors over gambling debts. Defendant admitted owing $2,500.00 to a Las Vegas gambling club and that he also had an outstanding unpaid check in the sum of $1,000.00 given as a result of a gambling transaction. He disclaimed owing anything upon this check, intimating that he had been swindled in a crooked game. Before making a gambling trip to Las Vegas, he borrowed a sum of money from a Savings and Loan Association, increasing the mortgage on his motel, for the purpose of making repairs on the motel and paying some outstanding obligations. He took $800.00 of this money to finance his trip to and his gambling at Las Vegas. Plaintiff testified that defendant's gambling activity caused her great concern and worry and that she asked defendant many times to give it up. Defendant denied that he had been asked to quit gambling and stated over and over again that he gambled "with her full knowledge and consent." It is established, however, that after this action was commenced, plaintiff and defendant and their respective attorneys met for the purpose of attempting a reconciliation between the parties; that one of the conditions which plaintiff demanded as a basis for reconciliation was that defendant give up gambling and that defendant refused to agree to do so.

Plaintiff testified that the first instance of actual physical abuse occurred on November 15, 1956, or about five months before their second daughter was born. That evening plaintiff and defendant had gone to a night club with two other couples. According to plaintiff defendant drank straight whiskey and became intoxicated. They stayed until the night club closed and then one of the couples came home with them. A Mrs. Meyer, who was an employee of the motel and had been taking care of the parties' children, then prepared something for them to eat. The guests left about 3 a. m. Plaintiff then scolded the defendant for the way he had behaved that night and defendant, according to plaintiff, struck her four or five times. As a result she suffered a bloody nose and a split lip. The defendant denies this testimony. Mrs. Meyer and one of the guests of the previous evening testified that they saw plaintiff the next morning at about 10 a. m. and she had a bruised face and a split lip. According to plaintiff, defendant also struck her on the following Thursday which was Thanksgiving and also on the following Sunday. Each of these incidents is denied by defendant. The affair, on Sunday, took place at the home of the defendant's parents and two of his relatives testified that they were in the house at the time and did not see defendant strike plaintiff. Plaintiff testified to other similar incidents which she says occurred on July 15, 1957, and August 29, 1957.

Defendant agrees that there was an argument between them on July 15. He became angry because he had let her persuade him to go to a moving picture show and during their absence no new customers had come to the motel. During the course of this argument, according to defendant, plaintiff came at him pointing her finger at him and he took her across his knee and spanked her. According to plaintiff, he pounded her head against a wall, slapped her many times and tore her dress to shreds. Plaintiff said that defendant's godfather and his wife came in while defendant was

slapping her and that the godfather restrained the defendant with difficulty. Neither party called the godfather as a witness. Plaintiff testified that on August 29, while she was preparing dinner, and defendant was lying on a couch watching television and defendant's father, who was visiting them was seated in a chair, the call bell in the office of the motel rang. Plaintiff asked defendant to answer the bell. She told him she couldn't leave her cooking. He then asked his father to answer it. Plaintiff then scolded defendant for asking his father to do something he should do himself. Then, according to plaintiff, defendant came into the kitchen, struck her several times, threw her to the floor and said, "I'm going to kill you."

The following day this action was commenced and plaintiff, acting upon the advice of her attorney, took her two children to Aberdeen, S. D. where she visited with an old friend. After a few weeks in Aberdeen she moved to Minneapolis where she and the children resided with one of her relatives. In December 1957, the parties, in an attempt to settle their difficulties, entered into a stipulation. The defendant agreed to provide living quarters for plaintiff and the children outside of the motel and the plaintiff agreed to move back to Bismarck with the children. Both parties agreed to obtain psychiatric examination and treatment in an effort to improve their family relations.

Pursuant to the stipulation the plaintiff returned to Bismarck with the children and took up her abode in quarters furnished by defendant and both parties consulted a psychiatrist. About New Years 1958, the parties apparently attempted a reconciliation and plaintiff resumed residence with the defendant at the motel. The attempt, however, only resulted in further violent quarrels and about February 1, separate quarters were provided for the plaintiff and the children at the motel. An amended complaint asking for a divorce was served on February 6.

According to plaintiff, defendant came to her apartment on the evening of February 15, pulled her hair and slapped her many times, and fearing for her safety she took the children and went to Tyler Cabins, another motel. The defendant followed her and later the same evening she went to the home of her friend where she stayed all night. The next day she moved to the Lewis & Clark Hotel in Mandan. Plaintiff complains that, from this time on until the time of the trial, defendant kept her under constant surveillance. Upon this record, plaintiff clearly established extreme cruelty as a ground for divorce. The cruelty was both physical and mental and grievous in character. See Section 14–05–05, NDCC.

In his counterclaim, however, defendant alleged misconduct upon the part of the plaintiff which he claims entitles him to divorce and the custody of their children. The first specifications of misconduct relate to plaintiff's use of intoxicating liquor. These are itemized in detail. Item 1. "She used beer daily." This is true. She admitted that she drank a can or two of beer with the defendant every evening before eating. Defendant testified that he bought beer in 48 can cases. Item 2. "She has gone out at night alone and returned home drunk." This charge refers to her visits to see her friend Betty B. which defendant testified occurred once a week. Plaintiff admitted that upon these occasions she had a drink or two and defendant's testimony is that he smelled liquor on her breath when she came home and that sometimes she was in advanced state of intoxication. Items 3, 4 and 5 may be considered together. They are; 3, "She had been carried out of a bar by her husband." 4, "She drank in the daytime with women friends." 5, "She drank with other men at a bar in Bismarck." All three of these charges relate to a single series of incidents. According to plaintiff, she made an appointment to meet a woman friend in the Blue Blazer Lounge for an after shopping drink at 5 p. m. The two women met, sat down at a table and ordered drinks.

A man whom they both knew came over and sat down at their table. Before the first drink was finished defendant came in, in a rage, picked the plaintiff up bodily and carried her out the back door of the bar. When they arrived home plaintiff informed defendant that she had left her purse in the bar and he sent her back alone to get it. Item 6. "She drank at Williston with other men in a night club." This incident took place on an occasion when plaintiff and defendant were visiting in Williston. They had arrived at the home of one of plaintiff's friends, where they were to stay during their visit, in the middle of the afternoon. Within a few minutes after arriving, defendant left for the purpose of finding a gambling game. Before leaving, however, he told his wife and his hostess that he would be back at 10 p. m. and take them out to a night club for dinner. Ten o'clock arrived but the defendant did not. Between ten-thirty and eleven o'clock plaintiff made several phone calls in an attempt to locate defendant but failed. Shortly after eleven o'clock plaintiff and her hostess decided to go to the State Line, a night club, located west of Williston thinking that they would find defendant there. Shortly after their arrival at the club they were joined at their table by a male acquaintance of the hostess. Sometime later the defendant came in, in a jovial mood, joined them at their table and bought a round of drinks. He then excused himself to go to the gaming room. Plaintiff and her friend remained and danced with friends of the friend until after midnight. Plaintiff then joined defendant at the gaming table and watched him play until three o'clock a. m., at which time he had lost all his money. Item 7. "She has been drunk in public places repeatedly." This charge finds no support in the evidence. There is evidence that she was intoxicated on one occasion in a public place. On that occasion, she was with the defendant who took her to a bar at five o'clock in the afternoon and bought drinks and drank with her until nine o'clock in the evening.

Another series of charges is itemized under the heading: "She used physical force upon her husband and the children." It is said that she pointed her finger at her husband, that she scratched him, that she has thrown objects at him and struck him with her fists, and that she has slapped the children. Plaintiff does not deny these charges in so far as they relate to action against the defendant. It is admitted that their quarrels were violent on both sides. She stoutly maintained, however, that she did not abuse the children.

Another group of charges concerns verbal abuse of her husband and the members of his family. We have no doubt but that, although these charges are exaggerated, they are in the main true and that the language used by plaintiff at times was indelicate in character, but not more so than the language used by the defendant.

The most serious charges against plaintiff relate to her alleged consorting with men other than her husband in rooms at a Mandan Hotel. The only proof with respect to these charges rests in the testimony of a bell boy at the hotel. This boy had been asked by defendant to watch the plaintiff for the purpose of getting evidence to use in the divorce case. The young man testified that he did not know how much he was to be paid because there was no agreement. He had not been paid anything at the time he testified. It was established that he had told his employer and other people about the hotel, that he was a student at the Bismarck Junior College, and that he was an excellent student and getting "A" grades. He also told that he had been a male nurse at the Bismarck Hospital and he represented that he was 19 years old. All of these statements were untrue. Part of his testimony on direct examination is as follows:

"Q. Have you ever seen Ray M. and Betty Azar kissing each other? A. Yes.

"Q. Could you tell me where? A. In Room 226.

"Q. Could you tell me what time of the evening? A. It was fairly late in the evening.

"Q. Were you called to the room to bring liquor up there? A. Yes.

"Q. Now, would you tell me just where they were and how you saw them? A. There is a walk-in closet right in front of the bathroom. They were standing between the bathroom and the walk-in closet.

"Q. Now, let's go back here, Carroll. When you were called to the room you came to the room with the liquor and rapped on the door, is that right? A. That is correct.

"Q. And what, if anything, happened after you rapped on the door? A. Ray M. said, 'Come in.'

"Q. And did you walk in? A. Yes.

"Q. And after you got in did you see them directly standing there kissing each other? A. Well, no. It was through a mirror.

"Q. You were standing in the doorway? A. Yes, that is correct.

"Q. Now, where is the mirror? A. It was hanging on the wall.

"Q. And you saw them reflected in that? A. Yes.

"Q. Where were they standing? A. They were standing between the bathroom and the walk-in closet."

On his cross-examination, about 25 pages further on in the transcript, the witness's version of the alleged incident was as follows:

"Q. Now, on what occasion and where were they when you claimed

you saw them kissing each other? A. In Room 223.

"Q. 223, and what was the date? A. Second month, twenty-sixth day 1959. * * *

"Q. All right, who else was present when you say they were kissing each other then? A. The other couple.

"Q. In the same room? A. Yes.

"Q. And about what time of day was that? A. About nine-thirty.

"Q. Was that when you first brought the drinks up? A. Yes.

"Q. How long were you in Room 223 on that occasion? A. About a minute.

"Q. And where were they when you saw them kissing that you claim? A. They were on the couch. * * *."

The witness had testified that Ray M. had registered at about 6:30 p. m. on February 26, 1959; that he was sure of the date because after defendant had asked him to watch plaintiff he made entries in a notebook. He also testified that Ray M. was given Room 206 and he took him to that room. Later he testified that Ray M. had been assigned to Room 226 that night. The records of the hotel show that Ray M. was not registered in the hotel that night.

The testimony of this witness is so riddled with contradictions and inconsistencies that none of it is worthy of belief. It will therefore be disregarded in its entirety.

Psychiatric evaluations of the parties were received in evidence. That of the plaintiff is as follows:

"* * * It was felt that she was emotionally labile. She tended to indulge in superlatives and showed some traits which are commonly found in hysterical types of women. It was not felt that she was psychotic but rather felt that she had a neurotic character disorder. The clinical impression was psychoneurotic reaction, mixed type. The psychological tests revealed an intelligence in the bright normal range. It was felt that she could conceptualize ideas upon a high level but had little of that concrete practical intelligence for handling the details of every day life. It was felt that she emphasized intellectual resources rather than interest in relating to others. It was felt that although she gives the impression of having rich capacities for emotional warmth, this was a facade in order to control and actually avoid interpersonal intimacy. In summary, both the psychological and psychiatric tests base out a well established neurotic approach to life with the incorporation of these neurotic traits into her character structure."

As to the defendant the report reads:

"In the psychiatric examination Mr. Azar is a quiet, socially distant, mildly suspicious individual who reacts in a slow manner to questions. He occasionally misuses words, sometimes would not complete a sentence and seemed to be 'absent minded.' His emotions are for the most part, subdued. He attempts to rationalize his own behavior, minimizing any ill effects of his gambling, and indicated that he had relatively few close friends. He was not considered to be psychotic but it was felt that he showed marked schizoid trends. In psychological testing the schizoid features, along with some paranoid trends, were much more apparent. He was quite hostile, negativistic and sees the world about him as being cold, unfriendly and devoid of affection. At times it is difficult for him to see things as others see them and he utilizes the mechanism of projecting blame onto others as a major defense. * * *."

In relation to the ability of the parties to reconcile their difficulties the expert opinion was:

"We believe it is fair to say that, if they remain together, no amount of treatment will enable them to enjoy a relatively peaceful married life, and it is also believed that if they are separated they will continue their contacts and continue their conflict."

The testimony in this case forcefully illustrates the accuracy of these psychiatric evaluations. From defendant's point of view it was plaintiff and not the defendant who failed to attend to business. He blamed her for drinking beer every day and for the cost it entailed when he bought the beer and drank it with her. He blamed her for persuading him to take her to a movie and for the speculative loss of business when they were gone. He blamed her for persuading him to take her to night clubs regularly and for the extravagance in spending $20 to $25 each time for food and drink. He blamed her for getting drunk in a public place when he took her to the bar and bought drinks for her for four hours. In fact defendant blamed plaintiff for most of their financial difficulties and attempted to exonerate himself of blame although it is conceded that he devoted a large part of his time to, and lost many hundreds of dollars in gambling.

The plaintiff's actions demonstrate her emotional instability. She countered criticism with criticism. She became hysterical in her anger and in her rages she would descend to vulgar abuse and sometimes to the throwing of dishes and ash trays.

The course of the parties' quarrels seems to have followed a regular pattern. The defendant, by his acts or criticism would provoke the plaintiff to anger. In her anger plaintiff would say and do things which would provoke the defendant to the point where he retaliated by physical abuse. As justification for his acts defendant said time and again, "She came lunging at me yelling and pointing her finger in my eye."

Just why defendant became so disturbed when plaintiff pointed her finger at him is not explained, it is perhaps best illustrated by defendant's statement, "She started again with her finger antagonizing me and at that time I took her over my knee—I couldn't stand it anymore."

As we have heretofore stated the record shows that the defendant committed acts against the plaintiff which amounted to extreme cruelty. It is also clear that plaintiff was not without fault.

While we do not consider that her conduct was as culpable as that of the defendant, it would, standing alone, be sufficient to constitute a ground for divorce in defendant's favor. She knew that her regular weekly visits to see her friend Betty B., her drinking with this friend either at her home or at some other place, her staying out until two o'clock a. m. and coming home on each of these occasions with the smell of liquor on her breath and sometimes in a condition which is described as "tipsy" caused him great concern and disturbed him mentally. So also did her comments imputing immorality to defendant's mother made in the presence of both the defendant and his mother.

Section 14–05–10, NDCC provides:

"Divorces must be denied upon showing

"1. * * *

"2. * * *

"3. * * *

"4. Recrimination."

Section 14–05–15, NDCC provides:

"Recrimination is a showing by the defendant of any cause of divorce against the plaintiff in bar of plaintiff's cause of divorce. * * *"

In this case defendant pleaded recriminatory matter both by way of answer and by counterclaim. In Hoellinger v. Hoellinger, 38 N.D. 636, 166 N.W. 519,

this court, construed the above statutes and held that they constituted an absolute bar to a divorce in a case where plaintiff and defendant had pleaded and proved facts constituting statutory grounds for divorce, each against the other. In so holding the court said (38 N.D. 647, 166 N.W. 522):

"Where, as in North Dakota, the legislature has provided the same legal effect for every recognized cause for divorce, it is not for the courts to measure the gravity of the different causes. They should not determine that an offense which, in their judgment, may be a stronger cause for divorce than some other which is recognized by the legislature, overcomes the effect of the complaining party's seemingly lesser offense." See Wolf v. Wolf, 41 N.D. 106, 169 N.W. 577; Albrecht v. Albrecht (N.D.) 92 N.W.2d 726.

█ In the instant case where the legitimate ends and objects of matrimony have been utterly destroyed we are of the view that the interests of the parties, their children and of the public would be best served by granting a divorce to either or both parties, as is the practice in many other states where it is held that the courts are vested with a discretion either to allow or disallow recrimination as a defense. Hensley v. Hensley, 213 Ark. 755, 212 S.W.2d 551; Hendricks v. Hendricks, 125 Cal.App. 2d 239, 270 P.2d 80; Pavletich v. Pavletich, 50 N.M. 224, 174 P.2d 826; Vincent v. Vincent, 208 Okl. 470, 257 P.2d 512; McFadden v. McFadden (Tex.Civ.App.) 213 S.W. 71; Hendricks v. Hendricks, 123 Utah 178, 257 P.2d 366.

█ We have reluctantly come to the conclusion, however, that a divorce must be denied in this case. The language of the statute is mandatory. It requires that a divorce must be denied where recrimination is shown and in divorce matters this court has no inherent equitable powers by which the rigor of this statute may be ameliorated. On many occasions we have

held that jurisdiction in divorce matters is wholly statutory and that the court's power to deal with such matters must find support in statute or in the constitution. Leifert v. Wolfer, 74 N.D. 746, 24 N.W.2d 690, 169 A.L.R. 633; Agrest v. Agrest, 75 N.D. 318, 27 N.W.2d 697; Brandt v. Brandt, 76 N.D. 99, 33 N.W.2d 620; Stoutland v. Stoutland's Estate (N.D.) 103 N.W. 2d 286. Questions of the expediency or of the policy of a law are for the legislature alone. As was said in Territory of Dakota v. Taylor, 1 Dak. (459) 479:

" * * * The court cannot make, or unmake, laws. It must take them as they are, and not, as in some instances, it might wish them to be. A court must not deviate, one jot or one tittle, from the law as it is. If the law is bad, it is not for the judiciary, but for the people themselves, through their representatives in the Legislative Assembly, to change, modify or repeal it."

█ The judgment of divorce in favor of the defendant must therefore be reversed and a new judgment denying a divorce to either party entered. Separate maintenance, however, may be allowed where a divorce is denied. (Section 14–05–26, NDCC).

█ There remain the questions of the custody of the children of the parties and of the allowance of support for the children and the plaintiff. The trial judge determined that the defendant's sister should have the custody of the children and made no allowance whatever to the plaintiff. The arrangement for the custody of the children was more or less temporary in character, and upon a hearing upon a motion pending this appeal to modify the order as to custody there appeared to be some doubt as to whether the order of the trial court was being fully carried out. It also appeared that at the time of the trial the defendant was heavily in debt and his income was uncertain. The plaintiff was working, earning a good salary and living

in the Lewis & Clark Hotel. There was no showing as to what arrangements she could make to give the children adequate care.

For these reasons and the fact that there may have been substantial changes in the circumstances of the parties since the entry of the judgment herein, we are of the opinion that the questions of custody and allowances should be reviewed by the district court, not only in the light of the evidence in this case, but also in the light of the present circumstances of the parties. The case is therefore remanded to the district court with directions to enter a judgment denying a divorce, and to hold additional hearings for the purposes outlined above. Plaintiff is to have her costs and disbursements upon this appeal.

SATHRE, C. J., and MORRIS and TEIGEN, JJ., and PHILIP R. BANGS, District Judge, concur.

STRUTZ, J., deeming himself disqualified did not participate; Honorable PHILIP R. BANGS, Judge of the First Judicial District, sitting in his stead.