Hamish Morrison MANN, Plaintiff and Respondent,

v.

Emily Amelia MANN, Defendant and Appellant.

No. 8026.

Supreme Court of North Dakota.

March 7, 1963.

Rehearing Denied March 22, 1963.

Shaft, Benson & Shaft, Grand Forks, for defendant and appellant.

Robert A. Alphson, Grand Forks, for plaintiff and respondent.

TEIGEN, Judge.

The plaintiff, Hamish Morrison Mann, brought this action for a divorce against the defendant, Emily Amelia Mann. The complaint alleges that the defendant has been guilty of willful desertion, which has continued for more than one year previous to the commencement of the action, and extreme cruelty. Judgment is demanded for a decree of divorce and for the custody and care of the minor children to the marriage. The complaint asks the court to determine reasonable alimony to be paid by plaintiff to defendant. The defendant answers and denies the allegations of cause and pleads that the plaintiff departed from the home of the parties in Scotland and first went to Canada and then to the United States, that plaintiff has never offered the defendant the opportunity of coming to live with him at his home in the United States and that he has never furnished her with the necessary funds to transport herself and the children to his place of residence. The defendant prays the plaintiff's cause be dismissed, that she be awarded such alimony, temporary and permanent, and such support money for the minor children, temporary and permanent, as the court may deem just, and that she have her costs and disbursements, including reasonable attorney fees, together with such other and further relief as to the court may seem just.

Although the plaintiff resides in Grand Forks County, the case was docketed and tried in Barnes County, North Dakota. The trial court found that the defendant had deserted the plaintiff and that the plaintiff was entitled to a divorce. The trial court further found that the defendant was entitled to custody of the minor children of the parties and to the sum of $200 per month as and for their support, plus $400 attorney fees for local attorneys, no fee being allowed her attorney in Scotland, and, in addition, allowed the defendant $310, which was one-half of the costs incurred by the defendant in connection with certain depositions taken in Scotland and introduced in evidence. The court in its decree provided that the personal property in the possession of each of the respective parties shall remain in their possession and considered as their own.

The defendant has appealed from the judgment and demanded trial de novo in this court.

The defendant specifies that the court erred: (1) In granting the plaintiff a decree of divorce; (2) In not providing alimony for the defendant; (3) In providing for support money for the minor children in an insufficient amount; and (4) In not allowing the defendant all of her costs and disbursements.

The plaintiff is an ear, nose and throat specialist who had previously practiced his profession in Scotland and Canada. At the time of this action, he was admitted to practice and was practicing in Grand Forks, North Dakota. The defendant is a general physician admitted to practice in Scotland. The plaintiff is about forty years of age and the defendant about thirty-six years of age. The parties were married on April 30, 1952, at Glasgow, Scotland, the residence of both parties. They lived together as husband and wife in Scotland until June 3, 1955, when, by agreement of the parties, the plaintiff left for Winnipeg, Canada. At this time the parties had one child, Catriona, born October 8, 1953, and the de-

fendant was pregnant. It was agreed the defendant would remain in Scotland until after the birth of the child and that she would join him later in Canada with the children. Plaintiff became associated with the Winnipeg Clinic in the ear, nose and throat department. While in Winnipeg, he purchased a large five-bedroom home for $12,000. The defendant remained in Scotland because she had a previous difficult pregnancy and it was agreed by both parties that it would be to their mutual advantage that she remain in Scotland until after the confinement. The second child was born October 14, 1955. She was named Elizabeth. The defendant was hospitalized for several months thereafter. In the spring of 1956, defendant sold the home in Scotland in which the parties had lived preparatory to joining her husband in Canada. After paying the debt on the home and repaying the money borrowed for the down-payment, nothing remained from the purchase price. The plaintiff was dissatisfied with his practice in Winnipeg, Canada, and, in January of 1957, he left Winnipeg and moved to Grand Forks, North Dakota, where he again became engaged in his specialty.

In September or October of 1958, the plaintiff visited his wife in Scotland for about two weeks. During this visit the parties lived as husband and wife. Since about the middle of 1957, the plaintiff has rented a two-bedroom home at Grand Forks.

Plaintiff has been sending some money for the support of the defendant and the children. He has sent her approximately $200 per month, although it was often late. It also appears that this amount was not sufficient and the defendant supplemented it with her earnings. However, at no time did the plaintiff send to the defendant funds with which to come to the United States. It is the contention of the plaintiff that the defendant had sufficient money with which to make the trip and that she could have obtained money from the plaintiff's mother if necessary. He testified he

was always willing to help with the fare but it does not appear that at any time did he forward the fare nor make a firm offer to do so.

The parties corresponded and a number of the letters have been introduced in evidence. The plaintiff, however, was unable to introduce any letter in which the defendant stated she refused to come to America. The defendant maintained that she was always ready to join the plaintiff and that she wanted to but that the plaintiff was always very vague about future arrangements and he would not commit himself to anything specific. The defendant further maintains that the plaintiff was very guarded in what he said and made no definite proposal for the move, that she received no specific invitation to come to live with him and that he always seemed very undecided. Further, at no time did he forward to her the fare or otherwise make it possible for her to pay the cost of the trip for herself and her children. She testified that she was willing and desirous to resume married life with her husband and that this has always been her attitude.

Some time between January and March of 1959, it was suggested that the defendant come alone to the United States on a vacation. This appears to have been at the defendant's suggestion and was agreed to by the plaintiff. He stated that he could help with the fare. The defendant made necessary arrangements to travel, obtaining provisional reservations with a travel agency, but testified her husband failed to send the additional money necessary to enable her to make up the price of the ticket and, therefore, it had to be cancelled. She also testified that as early as March or April of 1956, she started preparations to go to America. She sold the house, as we have stated, went to the Canadian Immigration Office and arranged for passports, and took the usual clinical examination and x-rays. She took all necessary preliminary steps to make the trip.

It was agreed at that time that the defendant's mother and her sister should accompany the family to Canada where the plaintiff was then living. This was at the request of the plaintiff, who wished the defendant to practice medicine in Canada and felt that the mother-in-law could care for the children. The defendant's sister was about to be married and the plaintiff had suggested that she could be married in Canada as well as in Scotland, as her fiance lived in Malaya. It was for this reason the plaintiff purchased the large house in Winnipeg, Canada. He had explained to the defendant that the house had three floors and was so constructed that the top floor would be ideal as a flat for the defendant's mother. Defendant maintains that the plaintiff's procrastinations caused her considerable anxiety.

The defendant's testimony was corroborated by the deposition of Dr. Stewart Mann, a brother of the plaintiff, who resides in Scotland. The plaintiff's testimony was corroborated by the deposition of his mother, who was a police judge in Scotland and for fifteen years before that had been a member of Parliament, sitting in the House of Commons in London. Both of these witnesses corroborate the defendant's testimony to the extent that she made preparations to join her husband in America by selling their home and then lived in temporary quarters provided by the plaintiff's mother at a nominal rental, that the plaintiff and defendant lived together as husband and wife when he vacationed in Scotland in 1958, and that the plaintiff was slow in sending money to the defendant. The plaintiff's corroborating witness, his mother, testified that in her opinion the defendant chose to attend her professional duties rather than go to her husband, that defendant was a poor housekeeper, and that she had more interest in her profession than keeping house or caring for the children. This, however, is disputed by the defendant's corroborating witnesses. The plaintiff's brother, testifying as a corroborating witness for the defendant, testified that on various

occasions he discussed with both plaintiff and defendant the plaintiff's desire to go to America, that the defendant was enthusiastic about it and raised no objection. She appeared prepared to go. He shared the impression that the defendant's mother would join the parties in America and that this was the agreement between the parties. He also testified that he believed the defendant would have gone to America had she received a real invitation to join the plaintiff, and that although he visited with the defendant on various occasions subsequent to the plaintiff's departure for America, he never found any evidence indicating defendant did not intend to join her husband when she could.

The second corroborating witness for the defendant, a Dr. Elizabeth Park, testified she knew both plaintiff and defendant and worked with them as a physician and had often discussed with the plaintiff his plans for going to America. She testified that plaintiff had discussed with this witness and other colleagues his plan whereby a group of doctors from Scotland would go to Canada together and set up a practice in that country. The witness was also acquainted with the family of the parties and corroborates the defendant's testimony to the effect that the parties planned that defendant's mother and sister would accompany the defendant and the children to Canada where defendant's sister would be married and the mother would remain to care for the children of the parties. Both of the defendant's corroborating witnesses testified that the defendant was a good housewife and a good mother to the children. Based on their observations, they testified these duties came ahead of her duties as a physician. Both of the defendant's corroborating witnesses testified that plaintiff's mother had been engaged in politics for years and has attracted a great deal of publicity in her life, that she was prejudiced in favor of her son and would minimize her son's faults and errors and magnify those of the defendant, and that this was done to partially minimize the possibility of bad family publicity.

Scotland had adopted a program called "The National Health Service" referred to by the plaintiff as socialized medicine and both parties felt they were restricted in their professional practice as a result thereof and that more money could be made in their profession in Canada or the United States. The defendant did not have regular employment with the National Health Service. She had occasional employment in which she substituted for other doctors who were on vacation. It appears her earnings were not sufficient to support herself and the family without assistance from her husband.

A number of letters between the parties were introduced in evidence which we have carefully examined. We do not find in any of defendant's letters that she has refused to come to her husband. These letters plainly indicate that both parties had money problems. The plaintiff often complained about the financial situation, the necessity of high expenditures to get started in his practice and taxes. The defendant was economizing to the best of her ability and assured her husband that none of his money was being spent extravagantly and expressed confidence in his ability, stating he eventually would be successful in the new venture. The letters in evidence are all dated subsequent to the plaintiff's move from Winnipeg, Canada, to Grand Forks, North Dakota. Most of them are from the defendant to the plaintiff. In none of them has she stated that she refused to join her husband but she often speaks of uncertainties and the lack of any concrete planning for her coming. In several letters reference is made to an earlier problem of their marriage. This perhaps has reference to the fact that the parties are of different religions, although it is not so stated in these letters. The testimony establishes that the defendant was Catholic and the plaintiff was Protestant. It was the plaintiff who raised the issues of uncertainty. The defendant in her letter following the

plaintiff's visit to Scotland states very definitely that she does want to join her husband in the United States but it appears no definite plans were made for her coming at that time and she expresses it in her letter as follows: "The tragedy at the moment is that we did not discuss the subject when you were here." She goes on to partially blame herself for not "wringing some sort of proposal from you." Later in the letter she states: "Well enough of that, if your invitation to join you is in fact not an invitation but an ultimatum then, of course, I have no choice. I must do it." The plaintiff had changed his mind about having the defendant's mother join her in coming and it becomes an issue between them. She then suggests that if she can find a job and save her money to pay the fare, and if he will send enough to provide for the children, she will come to visit him in the United States. The plaintiff answers the letter about 45 days later and apologizes for not sending money. He states he hardly made expenses but that he may be able to send some the following week. He then suggests her coming on vacation is a good idea and that he at least can help with the fare. He agrees that this may delay moving the family but then there are problems to solve—"having a built-in mother in law has the same, or more, disadvantages in the U. S. as elsewhere—anyway, come soon and we can enjoy what we enjoyed last September." The defendant in response states she will make provisional booking for the trip, that if she waits until she has the money there will be no chance of getting a booking and again asks him to send her a check each month to help support the children and help with the fare. Plaintiff in his subsequent letters is not at all sure as to how much he can help with the money problem. About a month later, the defendant again writes the plaintiff and advises that she is again out of a job. She states she has one to start soon and that her boss knows of her plans to go to Grand Forks. In June of 1959 she advises that the provisional reservation had been obtained for July 22 of that year. She also explains to plaintiff that a catastrophe happened when his mother late one night caused a scene because she was two weeks in arrears in the payment of the apartment rent which caused the defendant much humility. She writes another letter two days later further explaining the event and then explains the prior letter may have been a bit incoherent because she was upset. Approximately one month later, the plaintiff writes defendant in which he states: "After the unguided missile you directed at me, I have assumed you were not coming * * * Therefore, far from rushing off urgent letters in response to your S.O.S. of one week ago I was fully determined about seeing a lawyer about getting a divorce." He accuses her of changing her mind about coming and advises her that he has no funds to assist her. He again mentions meeting tax payments and states that his credit is fully extended. The defendant replied about three weeks later, August 7, 1959, indicating that she received a check from him for support and thanks him. She states in part: "I must say that I didn't change my mind about anything in the first place, so there could be no question of changing my mind again, as you put it." She explains that when she wrote the letter relative to the trouble she had with his mother, she was tired and depressed and at the end of her "tether." She again explains her unhappiness because of the uncertainty of the situation.

This takes us to a point within less than one year of the commencement of this action. It was commenced in May of 1960. The plaintiff writes again in February of 1960 advising that he is going to get a divorce and states to her that this is not difficult in North Dakota and he will allege grounds of cruelty and desertion. He advises her that she will receive notification as soon as he gets around to it and that the easiest way for her would be to ignore it. He threatens her that if she doesn't choose to ignore it, it will make no difference. Defendant answers stating she is dismayed to have to think of divorce and states: "The marriage vows you took are sacred and

binding for you as they are for me." She explains they each took the marriage vows freely "knowing it was 'for better or for worse', 'until death do us part'" and that it was not just a civil contract.

We have read this record with great care and are not satisfied that there has been any intent, expressed or implied, by the defendant to not join her husband. In fact, we believe the testimony shows a willingness upon her part to come to her husband as soon as she received assurance that he wanted her and provided the means with which to come.

■ The district court heard only the testimony of the plaintiff. The rest of the evidence was submitted in the form of depositions and exhibits. The preponderance of the evidence does not support his oral testimony that he tendered her a firm invitation to come or that she refused, nor does it support his contention that she had ample means with which to make the trip. We do not believe there is evidence to establish that plaintiff suffered cruel treatment at the hands of the defendant.

■ It is well settled that desertion, which is a ground for divorce, must be willful. Section 14–05–03, N.D.C.C. It is the voluntary separation of one of the married parties from the other with the intent to desert. Absence or separation, proper in itself, does not become desertion until the intent to desert is fixed during such absence or separation. Section 14–05–06(5), N.D.C.C. It is our opinion, therefore, that the judgment of divorce must be reversed.

■ In view of the long separation of the parties, the great distance separating them, and the effect this action for divorce has likely had on their attitude toward each other, it is likely, at least for the present, that the parties will continue to live apart and that provision must be made for the maintenance of the defendant and the minor children, and for custody of the minor children. Azar v. Azar (N.D.), 112 N.W. 2d 1; Henry v. Henry, 77 N.D. 845, 46 N.W.2d 701.

The statute provides:

"Though a judgment of divorce is denied, the court in an action for divorce may provide for the maintenance of a wife and her children, or any of them, by the husband." Section 14–05–26, N.D.C.C.

■■ The judgment of the trial court awarded custody of the children to the defendant. This is not challenged and we believe that custody of the children should remain in the defendant. The court also provided that the plaintiff should pay the defendant, as and for the support of the said minor children, the sum of $200 per month. The evidence discloses that the plaintiff is doing well in Grand Forks. In 1959 he had an adjusted gross income of $12,867.87. In 1960 this almost doubled. He had an adjusted gross income computed for income tax purposes of $23,482.89. This is considerably better than he could have done in Scotland according to his testimony. He testified he had reached his top earning capacity in Scotland which was 1,500 pounds, or the equivalent of about $4,500 per annum. After this action was commenced, defendant used money, which she had earned and saved for fare to visit her husband, to go back to college where she obtained a diploma of public health. This diploma qualified her to obtain an appointment as Assistant Medical Officer of Health for Renfrewshire. She obtained this position at an annual salary of 1,360 pounds, less certain deductions. This is equivalent to approximately $4,000. The plaintiff, on the other hand, in a statement furnished the court, reported that in 1960 he had a net earning of $13,716 after taxes. He reported living costs of $3,920, leaving him a net balance of $9,796. He reports he has been making some annual investments equalling about $900 per year and that he is driving two automobiles, one of which is a sports car.

We are satisfied that the plaintiff's contribution of $2,400 per year, on the basis of his reported earnings, is not sufficient to support his minor children on a standard of living to which they are entitled. Further, it is indicated from the testimony and the letters introduced in the evidence that the plaintiff's contributions, plus the defendant's earnings prior to trial, have afforded a rather meager existence for plaintiff's family. Considering the rising cost of living, the increasing age of the children and the ability of the plaintiff to contribute, there should be allowed to the defendant for the support of the two minor children the sum of $400 per month from and after the entry of judgment on remittitur in this case. Henry v. Henry, supra.

■ The defendant incurred, in connection with the taking of depositions of witnesses for the plaintiff and the defendant in Scotland, stenographer's fees of $210 and attorney's fees of $410 for a total of $620, of which the court allowed one-half or $310. We feel that under the circumstances the court should have allowed the defendant all of these expenses.

The judgment of the district court is reversed and the case is remanded for the entry of a judgment in accordance with the views expressed in this opinion.

MORRIS, C. J., and BURKE and STRUTZ, JJ., concur.

ERICKSTAD, J., not being a member to the Court at the time of the submission of this case, did not participate.

On Petition for Rehearing.

TEIGEN, Judge.

■ The respondent has petitioned for a rehearing on the single question of allowance of support money for the minor children. The petition is supported by the affidavit of the respondent in which he sets forth facts indicating there have been substantial changes in the circumstances of the parties since the entry of the judgment herein and prays in the alternative for a reduction in the amount of support money allowed by this court, or that the question of support money be remanded to the district court with directions to hold additional hearings for the purpose of determining the question.

For these reasons, we are now of the opinion that the question of allowance should be reviewed by the district court, not only in the light of the evidence in this case but also in the light of the present circumstances of the parties. The case is, therefore, remanded to the district court with directions to enter judgment denying a divorce, allowing the costs as directed in the opinion, and to hold additional hearings for the purpose outlined above.

A rehearing is denied.

MORRIS, C. J., and STRUTZ and BURKE, JJ., concur.

ERICKSTAD, J., not being a member of this Court at the time of submission of this case, did not participate.